## WISCONSIN DEPARTMENT OF REVENUE *v.* WILLIAM WRIGLEY, JR., CO.

No. 91–119.   Argued January 22, 1992—Decided June 19, 1992

SCALIA, J., delivered the opinion of the Court, in which WHITE, STE-
VENS, SOUTER, and THOMAS, JJ., joined, and in Parts I and II of which
O'CONNOR, J., joined. O'CONNOR, J., filed an opinion concurring in part
and concurring in the judgment, *post*, p. 236. KENNEDY, J., filed a dissent-
ing opinion, in which REHNQUIST, C. J., and BLACKMUN, J., joined, *post*,
p. 236.

*F. Thomas Creeron III*, Assistant Attorney General of
Wisconsin, argued the cause for petitioner. With him on the
briefs was *James E. Doyle*, Attorney General.

*E. Barrett Prettyman, Jr.*, argued the cause for respond-
ent. With him on the brief were *André M. Saltoun, H.
Randolph Williams, Barbara J. Janaszek*, and *Richard J.
Sankovitz*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Iowa et
al. by *Bonnie J. Campbell*, Attorney General of Iowa, *Harry M. Griger*, Spe-
cial Assistant Attorney General, and *Marcia Mason*, Assistant Attorney

JUSTICE SCALIA delivered the opinion of the Court.

Section 101(a) of Public Law 86–272, 73 Stat. 555, 15 U. S. C. § 381, prohibits a State from taxing the income of a corporation whose only business activities within the State consist of "solicitation of orders" for tangible goods, provided that the orders are sent outside the State for approval and the goods are delivered from out of state. The issue in this case is whether respondent's activities in Wisconsin fell outside the protection of this provision.

## I

Respondent William Wrigley, Jr., Co., is the world's largest manufacturer of chewing gum. Based in Chicago, it sells gum nationwide through a marketing system that divides the country into districts, regions, and territories. During the relevant period (1973–1978), the midwestern district included a Milwaukee region, covering most of Wisconsin and

General, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Warren Price III* of Hawaii, *Larry EchoHawk* of Idaho, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *Frederic J. Cowan* of Kentucky, *William J. Guste, Jr.,* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Don Stenberg* of Nebraska, *Tom Udall* of New Mexico, *Robert Abrams* of New York, and *Lacy H. Thornburg* of North Carolina; for the State of New Jersey et al. by *Robert J. Del Tufo,* Attorney General of New Jersey, and *Mary R. Hamill* and *Sarah T. Darrow,* Deputy Attorneys General, *Charles E. Cole,* Attorney General of Alaska, and *Winston Bryant,* Attorney General of Arkansas; for the City of New York by *O. Peter Sherwood, Edward F. X. Hart,* and *Stanley Buchsbaum;* and for the Multistate Tax Commission by *Paull Mines.*

Briefs of *amici curiae* urging affirmance were filed for the Committee on State Taxation of the Council of State Chambers of Commerce by *Amy Eisenstadt* and *Paul H. Frankel;* and for the Direct Selling Association by *Mario Brossi, Joseph N. Mariano, M. Douglas Adkins, Neil J. O'Brien,* and *Camille R. Comeau.*

parts of other States, which was subdivided into several geographic territories.

The district manager for the midwestern district had his residence and company office in Illinois, and visited Wisconsin only six to nine days each year, usually for a sales meeting or to call on a particularly important account. The regional manager of the Milwaukee region resided in Wisconsin, but Wrigley did not provide him with a company office. He had general responsibility for sales activities in the region, and would typically spend 80-to-95% of his time working with the sales representatives in the field or contacting certain "key" accounts. The remainder of his time was devoted to administrative activities, including writing and reviewing company reports, recruiting new sales representatives, making recommendations to the district manager concerning the hiring, firing, and compensation of sales representatives, and evaluating their performance. He would preside at full-day sales strategy meetings for all regional sales representatives once or twice a year. The manager from 1973 to 1976, John Kroyer, generally held these meetings in the "office" he maintained in the basement of his home, whereas his successor, Gary Hecht, usually held them at a hotel or motel. (Kroyer claimed income tax deductions for this office, but Wrigley did not reimburse him for it, though it provided a filing cabinet.) Mr. Kroyer also intervened two or three times a year to help arrange a solution to credit disputes between the Chicago office and important local accounts. Mr. Hecht testified that he never engaged in such activities, although Wrigley's formal position description for regional sales manager continued to list as one of the assigned duties "[r]epresent[ing] the company on credit problems as necessary."

The sales or "field" representatives in the Milwaukee region, each of whom was assigned his own territory, resided in Wisconsin. They were provided with company cars, but not with offices. They were also furnished a stock of gum

(with an average wholesale value of about $1,000), a supply of display racks, and promotional literature. These materials were kept at home, except that one salesman, whose apartment was too small, rented storage space at about $25 per month, for which he was reimbursed by Wrigley.

On a typical day, the sales representative would load up the company car with a supply of display racks and several cases of gum, and would visit accounts within his territory. In addition to handing out promotional materials and free samples, and directly requesting orders of Wrigley products, he would engage in a number of other activities which Wrigley asserts were designed to promote sales of its products. He would, for example, provide free display racks to retailers (perhaps several on any given day), and would seek to have these new racks, as well as pre-existing ones, prominently located. The new racks were usually filled from the retailer's existing stock of Wrigley gum, but it would sometimes happen—perhaps once a month—that the retailer had no Wrigley products on hand and did not want to wait until they could be ordered from the wholesaler. In that event, the rack would be filled from the stock of gum in the salesman's car. This gum, which would have a retail value of $15 to $20, was not provided without charge. The representative would issue an "agency stock check" to the retailer, indicating the quantity supplied; he would send a copy of this to the Chicago office or to the wholesaler, and the retailer would ultimately be billed (by the wholesaler) in the proper amount.

When visiting a retail account, Wrigley's sales representative would also check the retailer's stock of gum for freshness, and would replace stale gum at no cost to the retailer. This was a regular part of a representative's duties, and at any given time up to 40% of the stock of gum in his possession would be stale gum that had been removed from retail stores. After accumulating a sufficient amount of stale product, the representative either would ship it back to

Wrigley's Chicago office or would dispose of it at a local Wisconsin landfill.

Wrigley did not own or lease real property in Wisconsin, did not operate any manufacturing, training, or warehouse facility, and did not have a telephone listing or bank account. All Wisconsin orders were sent to Chicago for acceptance, and were filled by shipment through common carrier from outside the State. Credit and collection activities were similarly handled by the Chicago office. Although Wrigley engaged in print, radio, and television advertising in Wisconsin, the purchase and placement of that advertising was managed by an independent advertising agency located in Chicago.

Wrigley had never filed tax returns or paid taxes in Wisconsin; indeed, it was not licensed to do business in that State. In 1980, petitioner Wisconsin Department of Revenue concluded that the company's in-state business activities during the years 1973–1978 had been sufficient to support imposition of a franchise tax, and issued a tax assessment on a percentage of the company's apportionable income for those years. Wrigley objected to the assessment, maintaining that its Wisconsin activities were limited to "solicitation of orders" within the meaning of 15 U. S. C. §381, and that it was therefore immune from Wisconsin franchise taxes. After an evidentiary hearing, the Wisconsin Tax Appeals Commission unanimously upheld the imposition of the tax. CCH Wis. Tax Rep. ¶ 202–792 (1986). It later reaffirmed this decision, with one commissioner dissenting, after the County Circuit Court vacated the original order on procedural grounds. CCH Wis. Tax Rep. ¶ 202–926 (1987). The County Circuit Court then reversed on the merits, CCH Wis. Tax Rep. ¶ 203–000 (1988), but that decision was in turn reversed by the Wisconsin Court of Appeals, with one judge dissenting. 153 Wis. 2d 559, 451 N. W. 2d 444 (1989). The Wisconsin Supreme Court, in a unanimous opinion, reversed yet once again, thus finally disallowing the Wisconsin tax.

160 Wis. 2d 53, 465 N. W. 2d 800 (1991). We granted the State's petition for certiorari, 502 U. S. 807 (1991).

## II

In *Northwestern States Portland Cement Co.* v. *Minnesota*, 358 U. S. 450, 454 (1959), we considered Minnesota's imposition of a properly apportioned tax on the net income of an Iowa cement corporation whose "activities in Minnesota consisted of a regular and systematic course of solicitation of orders for the sale of its products, each order being subject to acceptance, filling and delivery by it from its plant [in Iowa]." The company's salesmen, operating out of a three-room office in Minneapolis rented by their employer, solicited purchases by cement dealers and by customers of cement dealers. They also received complaints about goods that had been lost or damaged in shipment, and forwarded these back to Iowa for further instructions. *Id.*, at 454–455. The cement company's contacts with Minnesota were otherwise very limited; it had no bank account, real property, or warehoused merchandise in the State. We nonetheless rejected Commerce Clause and due process challenges to the tax:

> "We conclude that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." *Id.*, at 452.

The opinion in *Northwestern States* was handed down in February 1959. Less than a week later, we granted a motion to dismiss (apparently on mootness grounds) the appeal of a Louisiana Supreme Court decision that had rejected due process and Commerce Clause challenges to the imposition of state net-income taxes based on local solicitation of orders that were sent out of state for approval and shipping. *Brown-Forman Distillers Corp.* v. *Collector of Revenue*, 234

La. 651, 101 So. 2d 70 (1958), appeal dism'd, 359 U. S. 28 (1959). That decision was particularly significant because, unlike the Iowa cement company in *Northwestern States*, the Kentucky liquor company in *Brown-Forman* did *not* lease (or own) any real estate in the taxing State. Rather, its activities were limited to

> "the presence of 'missionary men' who call upon wholesale dealers [in Louisiana] and who, on occasion, accompany the salesmen of these wholesalers to assist them in obtaining a suitable display of appellant's merchandise at the business establishments of said retailers . . . ." 234 La., at 653–654, 101 So. 2d, at 70.

Two months later, we denied certiorari in another Louisiana case upholding the imposition of state tax on the income of an out-of-state corporation that neither leased nor owned real property in Louisiana and whose only activities in that State "consist[ed] of the regular and systematic solicitation of orders for its product by fifteen salesmen." *International Shoe Co.* v. *Fontenot*, 236 La. 279, 280, 107 So. 2d 640 (1958), cert. denied, 359 U. S. 984 (1959).

Although our refusals to disturb the Louisiana Supreme Court's decisions in *Brown-Forman* and *International Shoe* did not themselves have any legal significance, see *Hopfmann* v. *Connolly*, 471 U. S. 459, 460–461 (1985); *United States* v. *Carver*, 260 U. S. 482, 490 (1923), our actions in those cases raised concerns that the broad language of *Northwestern States* might ultimately be read to suggest that a company whose only contacts with a State consisted of sending "drummers" or salesmen into that State could lawfully be subjected to (properly apportioned) income taxation based on the interstate sales those representatives generated. In *Heublein, Inc.* v. *South Carolina Tax Comm'n*, 409 U. S. 275 (1972), we reviewed the history of §381 and noted that the complaints of the business community over

the uncertainty created by these cases were the driving force behind the enactment of § 381:

> " 'Persons engaged in interstate commerce are in doubt as to the amount of local activities within a State that will be regarded as forming a sufficient . . . connectio[n] with the State to support the imposition of a tax on net income from interstate operations and 'properly apportioned' to the State.' " *Id.*, at 280, n. 5 (quoting S. Rep. No. 658, 86th Cong., 1st Sess., 2–3 (1959)).[1]

Within months after our actions in these three cases, Congress responded to the concerns that had been expressed by enacting Public Law 86–272, which established what the relevant section heading referred to as a "minimum standard" for imposition of a state net-income tax based on solicitation of interstate sales:

> "No State . . . shall have power to impose, for any taxable year . . . , a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
>
> "(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
>
> "(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the

---

[1] See also H. R. Rep. No. 936, 86th Cong., 1st Sess., 2 (1959) ("While it is true that the denial of certiorari is not a decision on the merits, and although grounds other than the preceden[t] of the *Northwestern [States]* cas[e] were advanced as a basis for sustaining the *Brown-Forman* and *International Shoe* decisions, the fact that a tax was successfully imposed in those cases has given strength to the apprehensions which had already been generated among small and moderate size businesses").

benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1)." 73 Stat. 555, 15 U. S. C. § 381(a).

Although we have stated that § 381 was "designed to define clearly a lower limit" for the exercise of state taxing power, and that "Congress' primary goal" was to provide "[c]larity that would remove [the] uncertainty" created by *Northwestern States*, see *Heublein, supra*, at 280, experience has proved § 381's "minimum standard" to be somewhat less than entirely clear. The primary sources of confusion, in this case as in others, have been two questions: (1) what is the scope of the crucial term "solicitation of orders"; and (2) whether there is a *de minimis* exception to the activity (beyond "solicitation of orders") that forfeits § 381 immunity. We address these issues in turn.

## A

Section 381(a)(1) confers immunity from state income taxes on any company whose "only business activities" in that State consist of "solicitation of orders" for interstate sales. "Solicitation," commonly understood, means "[a]sking" for, or "enticing" to, something, see Black's Law Dictionary 1393 (6th ed. 1990); Webster's Third New International Dictionary 2169 (1981) ("solicit" means "to approach with a request or plea (as in selling or begging)"). We think it evident that in this statute the term includes, not just explicit verbal requests for orders, but also any speech or conduct that implicitly invites an order. Thus, for example, a salesman who extols the virtues of his company's product to the retailer of a competitive brand is engaged in "solicitation" even if he does not come right out and ask the retailer to buy some. The key question in this case is whether, and to what extent, "solicitation of orders" covers activities that neither explicitly nor implicitly propose a sale.

In seeking the answer to that question, we reject the proposition put forward by Wisconsin and its *amici* that we must construe § 381 narrowly because we said in *Heublein* that "'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the Federal-State balance,'" 409 U. S., at 281–282 (citation omitted). That principle—which we applied in *Heublein* to reject a suggested inference from § 381 that States cannot regulate solicitation in a manner that might cause an out-of-state company to forfeit its tax immunity—has no application in the present case. Because § 381 unquestionably *does* limit the power of States to tax companies whose only in-state activity is "the solicitation of orders," our task is simply to ascertain the fair meaning of that term. *FMC Corp.* v. *Holliday*, 498 U. S. 52, 57 (1990).

Wisconsin views some courts as having adopted the position that an out-of-state company forfeits its § 381 immunity if it engages in "any activity other than requesting the customer to purchase the product." Brief for Petitioner 21; see also *id.*, at 19, n. 8 (citing *Hervey* v. *AMF Beaird, Inc.*, 250 Ark. 147, 464 S. W. 2d 557 (1971); *Clairol, Inc.* v. *Kingsley*, 109 N. J. Super. 22, 262 A. 2d 213, aff'd, 57 N. J. 199, 270 A. 2d 702 (1970), appeal dism'd, 402 U. S. 902 (1971)).[2] Arguably supporting this interpretation is subsection (c) of § 381,

---

[2] *Amici* New Jersey et al. contend that our summary disposition of *Clairol* binds us to this narrow construction of § 381(a). Though *Clairol* is frequently cited for this construction, the opinion in the case does not in fact recite it. In any event, our summary disposition affirmed only the *judgment* below, and cannot be taken as adopting the reasoning of the lower court. *Anderson* v. *Celebrezze*, 460 U. S. 780, 784, n. 5 (1983); *Fusari* v. *Steinberg*, 419 U. S. 379, 391–392 (1975) (Burger, C. J., concurring). The judgment in *Clairol* would have been the same even under a broader construction of "solicitation of orders," since the company's in-state activities included sending nonsales representatives to provide customers technical assistance in the use of Clairol products. 109 N. J. Super., at 29–30, 262 A. 2d, at 217. See *United States Tobacco Co.* v. *Commonwealth*, 478 Pa. 125, 136–137, 386 A. 2d 471, 476–477, cert. denied, 439 U. S. 880 (1978); *Gillette Co.* v. *State Tax Comm'n*, 56 App. Div. 2d 475, 479, 393 N. Y. S. 2d 186, 189 (1977), aff'd, 45 N. Y. 2d 846, 382 N. E. 2d 764 (1978).

which expands the immunity of subsection (a) when the out-of-state seller does its marketing through independent contractors, to include not only solicitation of orders for sales, but also actual sales, and *in addition* "the maintenance ... of an office ... by one or more independent contractors whose activities ... consist solely of making sales, or soliciting orders for sales ...."[3] The plain implication of this is that without that separate indulgence the maintenance of an office for the exclusive purpose of conducting the exempted solicitation and sales would have provided a basis for taxation—*i. e.*, that the phrase "solicitation of orders" does not embrace the maintenance of an office for the exclusive purpose of soliciting orders. Of course the phrase "solicitation of orders" ought to be accorded a consistent meaning within the section, see *Sorenson* v. *Secretary of Treasury*, 475 U. S. 851, 860 (1986), and if it does not embrace maintaining an office for soliciting in subsection (c), it does not do so in subsection (a) either. One might argue that the necessity of special permission for an office establishes that the phrase "solicitation of orders" covers only the actual requests for purchases or, at most, the actions absolutely essential to making those requests.

We think, however, that would be an unreasonable reading of the text. That the statutory phrase uses the term "solicitation" in a more general sense that includes not merely the ultimate act of inviting an order but the entire process associated with the invitation is suggested by the fact that §381

---

[3] Title 15 U. S. C. § 381(c) reads in its entirety as follows:

"For purposes of subsection (a) of this section, a person shall not be considered to have engaged in business activities within a State during any taxable year merely by reason of sales in such State, or the solicitation of orders for sales in such State, of tangible personal property on behalf of such person by one or more independent contractors, or by reason of the maintenance, of an office in such State by one or more independent contractors whose activities on behalf of such person in such State consist solely of making sales, or soliciting orders for sales, or [sic] tangible personal property."

describes "the solicitation of orders" as a subcategory, not of in-state *acts*, but rather of in-state *"business activities"*—a term that more naturally connotes courses of conduct. See Webster's Third New International Dictionary 22 (1981) (defining "activity" as "an occupation, pursuit, or recreation in which a person is active—often used in pl. <business *activities*>"). Moreover, limiting "solicitation of orders" to actual requests for purchases would reduce §381(a)(1) to a nullity. (It is obviously impossible to make a request without some accompanying action, such as placing a phone call or driving a car to the customer's location.) And limiting it to acts "essential" for making requests would engender endless uncertainty, contrary to the whole purpose of the statute. (Is it "essential" to use a company car, or to take a taxi, in order to conduct in-person solicitation? For that matter, is it "essential" to solicit in person?) It seems to us evident that "solicitation of orders" embraces request-related activity that is not even, strictly speaking, essential, or else it would not cover salesmen's driving on the State's roads, spending the night in the State's hotels, or displaying within the State samples of their product. We hardly think the statute had in mind only day-trips into the taxing jurisdiction by empty-handed drummers on foot. See *United States Tobacco Co. v. Commonwealth*, 478 Pa. 125, 140, 386 A. 2d 471, 478 ("Congress could hardly have intended to exempt only walking solicitors"), cert. denied, 439 U. S. 880 (1978). And finally, this extremely narrow interpretation of "solicitation" would cause §381 to leave virtually unchanged the law that existed before its enactment. Both *Brown-Forman* (where the salesman assisted wholesalers in obtaining suitable displays for whiskey at retail stores) and *International Shoe* (where hotel rooms were used to display shoes) would be decided as they were before, upholding the taxation.

At the other extreme, Wrigley urges that we adopt a broad interpretation of "solicitation" which it describes as having been adopted by the Wisconsin Supreme Court based on that

court's reading of cases in Pennsylvania and New York, see 160 Wis. 2d, at 82, 465 N. W. 2d, at 811–812 (citing *United States Tobacco Co.* v. *Commonwealth, supra; Gillette Co.* v. *State Tax Comm'n,* 56 App. Div. 2d 475, 393 N. Y. S. 2d 186 (1977), aff'd, 45 N. Y. 2d 846, 382 N. E. 2d 764 (1978)). See also *Indiana Dept. of Revenue* v. *Kimberly-Clark Corp.,* 275 Ind. 378, 384, 416 N. E. 2d 1264, 1268 (1981). According to Wrigley, this would treat as "solicitation of orders" any activities that are "ordinary and necessary 'business activities' accompanying the solicitation process" or are "routinely associated with deploying a sales force to conduct the solicitation, so long as there is no office, plant, warehouse or inventory in the State." Brief for Respondent 9, 19–20; see also J. Hellerstein, State Taxation ¶ 6.11[2], p. 245 (1983) ("[S]olicitation ought to be held to embrace other normal incidents of activities of salesmen" or the "customary functions of sales representatives of out-of-state merchants"). We reject this "routinely-associated-with-solicitation" or "customarily-performed-by-salesmen" approach, since it converts a standard embracing only a particular activity ("solicitation") into a standard embracing all activities routinely conducted by those who engage in that particular activity ("salesmen"). If, moreover, the approach were to be applied (as respondent apparently intends) on an industry-by-industry basis, it would render the limitations of § 381(a) toothless, permitting "solicitation of orders" to be whatever a particular industry wants its salesmen to do.[4]

---

[4] The dissent explicitly agrees with our rejection of the "ordinary and necessary" standard advocated by Wrigley. *Post,* at 236. It then proceeds, however, to adopt that very standard. It states that the test should be whether a given activity is one that "reasonable buyers would consider . . . to be a part of the solicitation itself and not a significant and independent service or component of value." *Post,* at 237. It is obvious that those activities that a reasonable buyer would consider "part of the solicitation itself" rather than an "independent service" are those that are *customarily* performed in connection with solicitation. Any doubt that this is what the dissent intends is removed by its later elaboration of its

In any case, we do not regard respondent's proposed approach to be an accurate characterization of the Wisconsin Supreme Court's opinion. The Wisconsin court construed "solicitation of orders" to reach only those activities that are "closely associated" with solicitation, industry practice being only one factor to be considered in judging the "close[ness]" of the connection between the challenged activity and the actual requests for orders. 160 Wis. 2d, at 82, 465 N. W. 2d, at 811–812. The problem with that standard, it seems to us, is that it merely reformulates rather than answers the crucial question. "What constitutes the 'solicitation of orders'?" becomes "What is 'closely related' to a solicitation request?" This fails to provide the "[c]larity that would remove uncertainty" which we identified as the primary goal of § 381. *Heublein*, 409 U. S., at 280.

We proceed, therefore, to describe what we think the proper standard to be. Once it is acknowledged, as we have concluded it must be, that "solicitation of orders" covers more than what is strictly *essential* to making requests for purchases, the next (and perhaps the only other) clear line is the one between those activities that are *entirely ancillary* to requests for purchases—those that serve no independent

---

test in the context of the facts of this case. The dissent repeatedly inquires whether an activity is a *"normal* ac[t] of courtesy from seller to buyer," *post,* at 242 (emphasis added); whether it is a *"common* solicitation practic[e]," *post,* at 244 (emphasis added); and whether Wrigley "exceed[ed] the *normal* scope of solicitation," *post,* at 242 (emphasis added). Of course, given Wrigley's significant share of the Wisconsin chewing gum market, *most* activities it chooses to "conduc[t] in the course of solicitation," *post,* at 246, will be viewed as a normal part of the solicitation process itself. Had Wrigley's sales representatives routinely approved orders on the spot; or accepted payments on past-due accounts; or even made outright sales of gum, it is difficult to see how a reasonable buyer would have thought that was *not* "part of the solicitation itself"—it certainly has no "independent value" to *him.* Nothing in the text of the statute suggests that it was intended to confer tax immunity on whatever activities are engaged in by sales agents in a particular industry.

business function apart from their connection to the soliciting of orders—and those activities that the company would have reason to engage in anyway but chooses to allocate to its in-state sales force.[5] Cf. *National Tires, Inc.* v. *Lindley,* 68 Ohio App. 2d 71, 78–79, 426 N. E. 2d 793, 798 (1980) (company's activities went beyond solicitation to "functions more commonly related to maintaining an on-going business"). Providing a car and a stock of free samples to salesmen is part of the "solicitation of orders," because the only reason to do it is to facilitate requests for purchases. Contrariwise, employing salesmen to repair or service the company's products is not part of the "solicitation of orders," since there is good reason to get that done whether or not the company has a sales force. Repair and servicing may help to *increase* purchases; but it is not ancillary to *requesting purchases,* and cannot be converted into "solicitation" by merely being assigned to salesmen. See, *e. g., Herff Jones Co.* v. *State Tax Comm'n,* 247 Ore. 404, 412, 430 P. 2d 998, 1001–1002

---

[5] The dissent states that ancillarity should be judged, not from the perspective of the seller, but from the persective of the *buyer. Post,* at 237 (test is whether "reasonable *buyers* would consider [the activities] to be a part of the solicitation itself") (emphasis added); *post,* at 243 ("The test I propose . . . requires an objective assessment from the vantage point of a reasonable *buyer"*) (emphasis added); *post,* at 246 (question is whether the activities "possess independent value to the *customer"*) (emphasis added). As explained earlier, see n. 4, *supra,* this rule inevitably results in a whatever-the-industry-wants standard, despite the dissent's unequivocal disavowal of such a test.

The dissent also suggests that ancillarity should be judged by asking whether a particular challenged activity is *"related* to a *particular* sales call or to a particular sales solicitation," *post,* at 244 (emphasis added). This standard, besides being amorphous, cannot be correct. Those activities that are most clearly *not* immunized by the statute—*e. g.,* actual sales, collection of funds—would seem to be the ones *most* closely "related" to particular acts of actual solicitation. And activities the dissent finds immunized in the present case—maintenance of a storage facility and use of a home office—are extremely remote.

(1967) (no §381 immunity for sales representatives' collection activities).[6]

As we have discussed earlier, the text of the statute (the "office" exception in subsection (c)) requires one exception to this principle: Even if engaged in exclusively to facilitate requests for purchases, the maintenance of an office within the State, by the company or on its behalf, would go beyond the "solicitation of orders." We would not make any more generalized exception to our immunity standard on the basis of the "office" provision. It seemingly represents a judgment that a company office within a State is such a significant manifestation of company "presence" that, absent a specific exemption, income taxation should always be allowed. *Jantzen, Inc.* v. *District of Columbia,* 395 A. 2d 29, 32 (D. C. 1978); see generally Hellerstein, State Taxation ¶ 6.4.

Wisconsin urges us to hold that no *postsale* activities can be included within the scope of covered "solicitation." We decline to do so. Activities that take place after a sale will ordinarily not be entirely ancillary in the sense we have described, see, *e. g.*, *Miles Laboratories* v. *Department of Revenue,* 274 Ore. 395, 400, 546 P. 2d 1081, 1083 (1976) (replacing damaged goods), but we are not prepared to say that will invariably be true. Moreover, the presale/postsale distinction is hopelessly unworkable. Even if one disregards the confusion that may exist concerning when a sale takes place, cf. Uniform Commercial Code § 2–401, 1A U. L. A. 675 (1989), manufacturers and distributors ordinarily have ongoing relationships that involve continuous sales, making it often im-

---

[6] Contrary to the dissent's suggestion, *post,* at 242, 246, both *Brown-Forman Distillers Corp.* v. *Collector of Revenue,* 234 La. 651, 101 So. 2d 70 (1958), and *International Shoe Co.* v. *Fontenot,* 236 La. 279, 107 So. 2d 640 (1958), would have been decided differently under these principles. The various activities at issue in those cases (renting a room for temporary display of sample products; assisting wholesalers in obtaining suitable product display in retail shops) would be considered merely ancillary to either wholesale solicitation or downstream (consumer or retailer) solicitation.

possible to determine whether a particular incidental activity was related to the sale that preceded it or the sale that followed it.

### B

The Wisconsin Supreme Court also held that a company does not necessarily forfeit its tax immunity under §381 by performing *some* in-state business activities that go beyond "solicitation of orders"; rather, it said, "[c]ourts should also analyze" whether these additional activities were "'deviations from the norm'" or "*de minimis* activities." 160 Wis. 2d, at 82, 465 N. W. 2d, at 811 (citation omitted). Wisconsin asserts that the plain language of the statute bars this recognition of a *de minimis* exception, because the immunity is limited to situations where "the *only* business activities within [the] State" are those described, 15 U. S. C. §381 (emphasis added). This ignores the fact that the venerable maxim *de minimis non curat lex* ("the law cares not for trifles") is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept. See, *e. g., Republic of Argentina* v. *Weltover, Inc.,* 504 U. S. 607, 618 (1992); *Hudson* v. *McMillian,* 503 U. S. 1, 8–9 (1992); *Ingraham* v. *Wright,* 430 U. S. 651, 674 (1977); *Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc.,* 425 U. S. 1, 18 (1976); *Industrial Assn. of San Francisco* v. *United States,* 268 U. S. 64, 84 (1925). It would be especially unreasonable to abandon normal application of the *de minimis* principle in construing §381, which operates in such stark, all-or-nothing fashion: A company either has complete net-income tax immunity or it has none at all, even for its solicitation activities. Wisconsin's reading of the statute renders a company liable for hundreds of thousands of dollars in taxes if one of its salesmen sells a 10-cent item in state. Finally, Wisconsin is wrong in asserting that application of the *de minimis* principle "excise[s] the word 'only' from the statute." Brief for Petitioner 27. The word "only" places

a strict limit upon the *categories* of activities that are covered by §381, not upon their *substantiality*. See, *e. g.*, *Drackett Prods. Co.* v. *Conrad*, 370 N. W. 2d 723, 726 (N. D. 1985); *Kimberly Clark*, 275 Ind., at 383–384, 416 N. E. 2d, at 1268.

Whether a particular activity is a *de minimis* deviation from a prescribed standard must, of course, be determined with reference to the purpose of the standard. Section 381 was designed to increase—beyond what *Northwestern States* suggested was required by the Constitution—the connection that a company could have with a State before subjecting itself to tax. Accordingly, whether in-state activity other than "solicitation of orders" is sufficiently *de minimis* to avoid loss of the tax immunity conferred by §381 depends upon whether that activity establishes a nontrivial additional connection with the taxing State.

## III

Wisconsin asserts that at least six activities performed by Wrigley within its borders went beyond the "solicitation of orders": the replacement of stale gum by sales representatives; the supplying of gum through "agency stock checks"; the storage of gum, racks, and promotional materials; the rental of space for storage; the regional managers' recruitment, training, and evaluation of employees; and the regional managers' intervention in credit disputes.[7] Since none of

---

[7] Wisconsin has also argued that the scope of the regional managers' activities caused their residences to be, "[in] economic reality," Wrigley offices in the State. Brief for Petitioner 32. If this means that having resident salesmen without offices can sometimes be as commercially effective as having nonresident salesmen with offices, perhaps it is true. But it does not establish that Wrigley "maintained an office" in the sense necessary to come within the exception to the "entirely ancillary" standard we have announced. See *supra*, at 230. Nor does the regional managers' occasional use of their homes for meetings with salesmen, or Kroyer's uncompensated dedication of a portion of his home basement to his own office. The maintenance of an office necessary to trigger the exception

these activities can reasonably be viewed as requests for orders covered by § 381, Wrigley was subject to tax unless they were either ancillary to requesting orders or *de minimis.*

We conclude that the replacement of stale gum, the supplying of gum through "agency stock checks," and the storage of gum were not ancillary. As to the first: Wrigley would wish to attend to the replacement of spoiled product whether or not it employed a sales force. Because that activity serves an independent business function quite separate from requesting orders, it does not qualify for § 381 immunity. *Miles Laboratories,* 274 Ore., at 400, 546 P. 2d, at 1083. Although Wrigley argues that gum replacement was a "promotional necessity" designed to ensure continued sales, Brief for Respondent 31, it is not enough that the activity facilitate *sales;* it must facilitate the *requesting of sales,* which this did not.[8]

The provision of gum through "agency stock checks" presents a somewhat more complicated question. It appears from the record that this activity occurred only in connection with the furnishing of display racks to retailers, so that it was arguably ancillary to a form of *consumer* solicitation. Section 381(a)(2) shields a manufacturer's "missionary" request that an indirect customer (such as a consumer) place an order, if a successful request would ultimately result in an order's being filled by a § 381 "*customer*" of the manufac-

---

must be more formally attributed to the out-of-state company itself, or to the agents of that company in their agency capacity—as was, for example, the rented office in *Northwestern States.*

[8] The dissent argues that this activity must be considered part of "solicitation" because, *inter alia,* it was "minimal," and not "significant." *Post,* at 243. We disagree. It was not, as the dissent suggests, a practice that involved simple "acts of courtesy" that occurred only because a salesman happened to be on the scene and did not wish to "harm the company." *Post,* at 242, 244. Wrigley deliberately chose to use its sales force to engage in regular and systematic replacement of stale product on a level that amounted to several thousand dollars per year, which is a lot of chewing gum.

turer, *i. e.*, by the wholesaler who fills the orders of the retailer with goods shipped to the wholesaler from out of state. Cf. *Gillette*, 56 App. Div. 2d, at 482, 393 N. Y. S. 2d, at 191 ("Advice to retailers on the art of displaying goods to the public can hardly be more thoroughly solicitation . . ."). It might seem, therefore, that setting up gum-filled display racks, like Wrigley's general advertising in Wisconsin, would be immunized by § 381(a)(2). What destroys this analysis, however, is the fact that Wrigley *made the retailers pay for the gum*, thereby providing a business purpose for supplying the gum quite independent from the purpose of soliciting consumers. Since providing the gum was not entirely ancillary to requesting purchases, it was not within the scope of "solicitation of orders."[9] And because the vast majority of the gum stored by Wrigley in Wisconsin was used in connection with stale gum swaps and agency stock checks, that storage (and the indirect rental of space for that storage) was in no sense ancillary to "solicitation."

By contrast, Wrigley's in-state recruitment, training, and evaluation of sales representatives and its use of hotels and homes for sales-related meetings served no purpose apart from their role in facilitating solicitation. The same must be said of the instances in which Wrigley's regional sales manager contacted the Chicago office about "rather nasty" credit disputes involving important accounts in order to "get the account and [Wrigley's] credit department communicat-

---

[9] The dissent speculates, without any basis in the record, that Wrigley might have chosen to charge for the gum, not for the profit, but because giving it away would "lower the per unit cost of all goods purchased," which "could create either the fact or the perception that retailers were not receiving the same price." *Post*, at 245. Though Wrigley's *motive* for choosing to make a profit on these items seems to us irrelevant in any event, we cannot avoid observing how unlikely it is that this was the reason Wrigley did not include free gum in its (per-unit-cost-distorting) free racks, although it did, as the record shows, regularly give away *other* (presumably per-unit-cost-distorting) free gum. Wrigley itself did not have the temerity to make this argument.

ing." App. 71, 72. It hardly appears likely that this mediating function between the customer and the central office would have been performed by some other employee—some company ombudsman, so to speak—if the on-location sales staff did not exist. The purpose of the activity, in other words, was to ingratiate the salesman with the customer, thereby facilitating requests for purchases.

Finally, Wrigley argues that the various nonimmune activities, considered singly or together, are *de minimis.* In particular, Wrigley emphasizes that the gum sales through "agency stock checks" accounted for only 0.00007% of Wrigley's annual Wisconsin sales, and in absolute terms amounted to only several hundred dollars a year. We need not decide whether any of the nonimmune activities was *de minimis* in isolation; taken together, they clearly are not. Wrigley's sales representatives exchanged stale gum, as a matter of regular company policy, on a continuing basis, and Wrigley maintained a stock of gum worth several thousand dollars in the State for this purpose, as well as for the less frequently pursued (but equally unprotected) purpose of selling gum through "agency stock checks." Although the relative magnitude of these activities was not large compared to Wrigley's other operations in Wisconsin, we have little difficulty concluding that they constituted a nontrivial additional connection with the State. Because Wrigley's business activities within Wisconsin were not limited to those specified in § 381, the prohibition on net-income taxation contained in that provision was inapplicable.

\* \* \*

Accordingly, the judgment of the Supreme Court of Wisconsin is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in Parts I and II, and concurring in the judgment.

I join Parts I and II of the Court's opinion. I do not agree, however, that the replacement of stale gum served an independent business function. The replacement of stale gum by the sales representatives was part of ensuring the product was available to the public in a form that may be purchased. Making sure that one's product is available and properly displayed serves no independent business function apart from requesting purchases; one cannot offer a product for sale if it is not available. I agree, however, that the storage of gum in the State and the use of agency stock checks were not ancillary to solicitation and were not *de minimis.* On that basis, I would hold that Wrigley's income is subject to taxation by Wisconsin.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE BLACKMUN join, dissenting.

Congress prohibits the States from imposing taxes on income derived from "business activities" in interstate commerce and limited to the "solicitation of orders" under certain conditions. 15 U. S. C. § 381(a). The question we face is whether Wrigley has this important tax immunity for its business activities in the State of Wisconsin. I agree with the Court that the statutory phrase "solicitation of orders" is but a subset of the phrase "business activities." *Ibid.; ante,* at 225–226. I submit with all respect, though, that the Court does not allow its own analysis to take the proper course. The Court instead devises a test that excludes business activities with a close relation to the solicitation of orders, activities that advance the purpose of the statute and its immunity.

The Court is correct, in my view, to reject the two polar arguments urged upon us: one, that ordinary and necessary business activities surrounding the solicitation of orders are

part of the exempt solicitation itself; and the other, that the only exempt activities are those essential to the sale. *Ante*, at 225, 227. Having done so, however, the Court exits a promising avenue of analysis and adopts a test with little relation to the practicalities of solicitation. The Court's rule will yield results most difficult to justify or explain. My submission is that the two polarities suggest the proper analysis and that the controlling standard lies between. It is difficult to formulate a complete test in one case, but the general rule ought to be that the statute exempts business activities performed in connection with solicitation if reasonable buyers would consider them to be a part of the solicitation itself and not a significant and independent service or component of value.

I begin with the statute. Section 381(a) provides as follows:

> "No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
>
> "(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
>
> "(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1)." 15 U. S. C. § 381(a).

The key phrases, as recognized by the Court, are "business activities" and "solicitation of orders." *Ante,* at 225–226. By using "solicitation of orders" to define a subset of "business activities," the text suggests that the immunity to be conferred encompasses more than a specific request for a purchase; it includes the process of solicitation, as distinguished from manufacturing, warehousing, or distribution. Congress could have written § 381(a) to exempt "acts" of "solicitation" or "solicitation of orders," but it did not. The decision to use the phrase "business activities," while not unambiguous, suggests that the statute must be read to accord with the practical realities of interstate sales solicitations, which, after all, Congress acted to protect.

The textual implication I find draws support from legal and historical context. Even those who approach legislative history with much trepidation must acknowledge that the statute was a response to three specific court decisions: *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450 (1959), *International Shoe Co.* v. *Fontenot,* 236 La. 279, 107 So. 2d 640 (1958), cert. denied, 359 U. S. 984 (1959), and *Brown-Forman Distillers Corp.* v. *Collector of Revenue,* 234 La. 651, 101 So. 2d 70 (1958), appeal dism'd, 359 U. S. 28 (1959). S. Rep. No. 658, 86th Cong., 1st Sess., 2–3 (1959) (hereinafter S. Rep.); H. R. Rep. No. 936, 86th Cong., 1st Sess., 1–2 (1959) (hereinafter H. R. Rep.). See *ante,* at 220–223, and n. 1. These decisions departed from what had been perceived as a well-settled rule, stated in *Norton Co.* v. *Department of Revenue of Ill.,* 340 U. S. 534 (1951), that solicitation in interstate commerce was protected from taxation in the State where the solicitation took place.

> "Where a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home office for acceptance, filling, and delivery back to the buyer, it is obvious that the State of the buyer has no local grip on the seller. Unless some local incident oc-

curs sufficient to bring the transaction within its taxing power, the vendor is not taxable." *Id.*, at 537.

Firm expectations within the business community were built upon the rule as restated in *Norton*. Companies engaging in interstate commerce conformed their activities to the limits our cases seemed to have endorsed. To be sure, the decision to stay at home might have derived in some respects from independent business concerns. The expense and commitment of an in-state sales office, for example, might have informed a decision to send salesmen into a State without further staff support. Some interstate operations, though, carried the unmistakable mark of a legal, rather than business, justification. The technical requirement that orders be approved at the home office, unless approval required judgment or expertise (for example, if the order depended on an ancillary decision to give credit or to name an official retailer), was no doubt the product of the legal rule.

These settled expectations were upset in 1959, their continuing vitality put in doubt by *Northwestern States*, *International Shoe*, and *Brown-Forman*. In *Northwestern States*, the Court upheld state income taxation against two companies whose in-state operations included a sales staff and sales office. 358 U. S., at 454–455. Our disposition was consistent with prior law, since both companies maintained offices within the taxing State. *Ibid.* But the Court's opinion was broader than the holding itself and marked a departure from prior law.

> "We conclude that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." *Id.*, at 452.

In the absence of case law giving meaning to "sufficient nexus," the Court's use of this indeterminate phrase cre-

ated concern and apprehension in the business community. S. Rep., at 2–4; H. R. Rep., at 1. Apprehension increased after our denial of certiorari in *International Shoe* and *Brown-Forman,* where the Louisiana Supreme Court upheld the taxation of companies whose business activities within the State were limited to solicitation by salespeople. S. Rep., at 3; H. R. Rep., at 2. The concern stemmed not only from the prospect for tax liability in an increasing number of States, but also from the uncertainty of its amount and apportionment, the burdens of compliance, a lack of uniformity under state law, the withdrawal of small businesses from States where the cost and complexity of compliance would be great, and the extent of liability for back taxes. S. Rep., at 2–4.

As first drafted by the Senate Finance Committee, §381(a) would have addressed the decisions in *Northwestern States, International Shoe,* and *Brown-Forman.* S. Rep., at 2–3; H. R. Rep., at 3; 105 Cong. Rec. 16378, 16934 (1959). The Committee recommended a bill defining "business activities" in three subsections, with one subsection corresponding to the facts in each of the three cases. S. 2524, 86th Cong., 1st Sess. (1959). Before the bill was enacted, however, the Senate rejected the third of these subsections, corresponding to *Northwestern States,* which would have extended protection to companies with in-state sales offices. 105 Cong. Rec. 16469–16477 (1959) (Senate debate on an amendment proposed by Sen. Talmadge (Ga.)). But the other two subsections, those dealing with the state-court decisions in *International Shoe* and *Brown-Forman,* were retained. 105 Cong. Rec., at 16367, 16376, 16471, 16934; H. R. Rep., at 3. Thus, while *Northwestern States* provided the first impetus for the enactment of §381(a), it does not explain the statute in its final form. By contrast, the history of enactment makes clear that §381(a) exempts from state income taxation at least those business activities at issue in *International*

*Shoe* and *Brown-Forman*. These cases must inform any attempt to give meaning to § 381(a).

International Shoe manufactured shoes in St. Louis, Missouri. Its only activity within the State of Louisiana consisted of regular and systematic solicitation by 15 salespeople. No office or warehouse was maintained inside Louisiana, and orders were accepted and shipped from outside the State. The salespeople carried product samples, drove in company-owned automobiles, and rented hotel rooms or rooms of public buildings in order to make displays. *International Shoe*, 236 La., at 280, 107 So. 2d, at 640; Hartman, "Solicitation" and "Delivery" Under Public Law 86–272: An Uncharted Course, 29 Vand. L. Rev. 353, 358 (1976).

Brown-Forman distilled and packaged whiskey in Louisville, Kentucky, for sale in Louisiana and elsewhere. It solicited orders in Louisiana with the assistance of an in-state sales staff. All orders were approved and shipped from outside the State. There was no in-state office of any kind. Brown-Forman salespeople performed two functions: they solicited orders from wholesalers, who were direct customers of Brown-Forman; and they accompanied the wholesalers' own sales force on visits to retailers, who were solicited by the wholesalers. The Brown-Forman salespeople did not solicit orders at all when visiting retailers, nor could they sell direct to them. They did assist in arranging suitable displays of the distiller's merchandise in the retail establishments. *Brown-Forman*, 234 La., at 653–654, 101 So. 2d, at 70.

The activities in *International Shoe* and *Brown-Forman* extended beyond specific acts of entreaty; they included merchandising and display, as well as other simple acts of courtesy from buyer to seller, such as arranging product displays and calling on the customer of a customer. The activities considered in *International Shoe* and *Brown-Forman* are by no means exceptional. Checking inventories, displaying products, replacing stale product, and verifying credit are all

normal acts of courtesy from seller to buyer. J. Hellerstein, 1 State Taxation: Corporate Income and Franchise Taxes ¶ 6.11[2], p. 245 (1983). A salesperson cannot solicit orders with any degree of effectiveness if he is constrained from performing small acts of courtesy. Note, State Taxation of Interstate Commerce: Public Law 86–272, 46 Va. L. Rev. 297, 315 (1960).

The business activities of Wrigley within Wisconsin have substantial parallels to those considered in *International Shoe* and *Brown-Forman*. Wrigley has no manufacturing facility in the State. It maintains no offices or warehouses there. The only product it owns in the State is the small amount necessary for its salespeople to call upon their accounts. All orders solicited by its salespeople are approved or rejected outside of the State. All orders are shipped from outside of the State. Other activities, such as intervening in credit disputes, hiring salespeople, or holding sales meetings in hotel rooms, do not exceed the scope of § 381(a); I agree with the Court that these too are the business activities of solicitation. *Ante*, at 234–235; App. 10–13.

The Department of Revenue, in an apparent concession of the point, does not contend that the business activities of Wrigley exceed the normal scope of solicitation; instead the Department relies on a distinction between business activities undertaken before and after the sale. Brief for Petitioner 18, 21. Under the Department's submission, acts leading to the sale are within the statutory safe harbor, while any act following the sale is beyond it. *Ibid.* I agree with the Court, as well as with the Supreme Court of Wisconsin, that this distinction is unworkable in the context of a continuing business relation with many repeat sales. *Ante*, at 230–231; App. to Pet. for Cert. A–41.

As the Court indicates, the case really turns upon our assessment of two practices: replacing stale product and providing gum in display racks. *Ante*, at 233. If the retailers relied on the Wrigley sales force to replace all stale product

and that service was itself significant, say on the magnitude of routine deliveries of fresh bread, then a separate service would seem to be involved. But my understanding of the record is that replacement of stale gum took place only during the course of regular solicitation. App. 27–28, 41, 58, 117–118. There was no contract to perform this service. There is no indication in the record that this was the only method dealers relied upon to remove stale product. It is not plausible to believe that by enacting § 381(a) Congress insisted that every sales representative in every industry would be prohibited from doing just what Wrigley did.

Acceptance of the stale gum replacement does not allow industry practices to replace objective statutory inquiry. The existence of a contract to perform this service, or an indication in the record that this service provided an independent component of significant value, would alter the case's disposition, regardless of the seller's intentions. The test I propose does not depend on the sellers' intentions or motives whatsoever; rather it requires an objective assessment from the vantage point of a reasonable buyer. If a reasonable buyer would consider the replacement of stale gum to provide significant independent value, then this service would subject Wrigley to taxation. The majority appears to concede the point in part when it observes Wrigley replaced stale gum free of charge, *ante*, at 234, n. 9, which provides a strong indication that the replacement of stale gum is valuable to Wrigley, not its customers, as an assurance of quality given in the course of an ongoing solicitation.

I agree with the Court's approach, which is to provide guidance by some general rule that is faithful to the precise language of the statute. But it ought not to do so without recognition of some of the most essential aspects of solicitation techniques. No responsible company would expect its sales force to decline giving minimal assistance to a retailer in replacing damaged or stale product. In enacting § 381(a), Congress recognized the importance of interstate solicitation

to the strength of our national economy. The statute must not to be interpreted to repeal the rules of good sales techniques or to forbid common solicitation practices under the threat of forfeiting this important tax exemption. Congress acted to protect interstate solicitation, not to mandate inefficiency.

Even accepting the majority's test on its own terms, the business activities which the Court finds to be within the safe harbor of the federal statute are less ancillary to a real sales solicitation than are the activities it condemns. The credit adjustment techniques and the training sessions the Court approves are not related to a particular sales call or to a particular sales solicitation, but the condemned display and replacement practices are. I do not understand why the Court thinks that a credit dispute over an old transaction, handled by telephone weeks or months later is exempt because it "ingratiate[s] the salesman with the customer, thereby facilitating requests for purchases," *ante,* at 235, but that this same process of ingratiation does not occur when a salesperson who is on the spot to solicit an order refuses to harm the company by leaving the customer with bad product on the shelf. If there were any distinction between the two, I should think we would approve the replacement and condemn the credit adjustment. The majority fails to address this anomaly under its test, responding instead that my observation of it suggests ambiguity in my own. *Ante,* at 229, n. 5. In my view, both the gum replacement and credit adjustment are within the scope of solicitation.

I would agree with the Court that the furnishing of racks with gum that is sold to the customer presents a problem of a different order, *ante,* at 233, but here too I think it adds no independent value apart from the solicitation itself. To begin with, I think it rather well accepted that the setting up of display racks and the giving of advice on sales presentation is central to the salesperson's role in cultivating customers. There are dangers for the manufacturer, however,

if the salesperson spends the time to set up a display and then stocks it with free goods, because this could create either the fact or the perception that retailers were not receiving the same price. Free goods lower the per unit cost of all goods purchased. The simplest policy to avoid this problem is to charge for the goods displayed, and that is what occurred here. Moreover, I cannot ignore, as the Court appears to do, that a minuscule amount of gum, no more than 0.00007% (seven one-hundred thousands of one percent) of Wrigley's in-state sales, was stocked into display racks in this fashion. Brief for Respondent 5; App. to Pet. for Cert. A–43. Indeed, the testimony is that Wrigley salespeople would stock these display racks out of their own supply of samples only as a matter of last resort, in instances where the retailer possessed an inadequate supply of gum and could not await delivery in the normal course.

"Q Well, I take it that if you put in the stand and it was a new stand, you took the gum out of your vehicle and transferred it to him there; is that correct?

"A No, I would not say that's correct.

"Q Well, did you ever stock new stands from your vehicle?

"A I would say possibly on some—on a few occasions.

"Q And how many few occasions were there during your tenure as a field representative in 1978?

"A Boy. I would just be guessing. Maybe a dozen times.

"Q And just what would—what all happened in that circumstance that you wound up putting in a new stand and taking the gum out of your vehicle and transferring it to the retailer?

"A Well, like I said, primarily I wanted to get a stand in and then he wanted to get that order through his wholesaler; but if he couldn't wait, if he said my wholesaler was just in yesterday or something or he was not going to be in for a week, he didn't want a stand

sitting around, so we would then fill it and then bill the wholesaler. . . ." App. 37–38.

Under the circumstances described here, I fail to see why the stocking of a gum display does not "ingratiate the salesman with the customer, thereby facilitating requests for purchases," *ante,* at 235, as is required under the rule formulated by the Court. The small amount of gum involved in stocking a display rack, no more than $15–$20 worth, belies any speculation, *ante,* at 234, n. 9, that Wrigley was driven by a profit motive in charging customers for this gum. App. 38.

The Court pursues a laudable effort to state a workable rule, but in the attempt condemns business activities that are bound to solicitation and do not possess independent value to the customer apart from what often accompanies a successful solicitation. The business activities of Wrigley in Wisconsin, just as those considered in *International Shoe* and *Brown-Forman,* are the solicitation of orders. The swapping of stale gum and the infrequent stocking of fresh gum into new displays are not services that Wrigley was under contract to perform; they are not activities that can be said to have provided their own component of significant value; rather they are activities conducted in the course of solicitation and whose legal effect should be the same. My examination of the language of the statute, considered in the context of its enactment, demonstrates that the concerns to which § 381(a) was directed, and for which its language was drafted, are misapprehended by the Court's decision today.

I would affirm the judgment of the Wisconsin Supreme Court.