### ALCOA BUILDING PRODUCTS, INC. *vs.* COMMISSIONER OF REVENUE.

Suffolk. September 5, 2003. - October 21, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Taxation,* Abatement, Corporate excise, Appellate Tax Board: appeal to Supreme Judicial Court. *Administrative Law,* Agency's interpretation of statute, Substantial evidence.

Discussion of the State excise tax on foreign corporations and the limitations imposed on it by Federal law. [226-229]

This court concluded that the Appellate Tax Board (board), in affirming the denial of applications for the abatement of corporate excise taxes assessed, applied the appropriate legal standard and reasonably could determine that the activities within the Commonwealth of the sales staff of the plaintiff, a foreign corporation which manufactures and sells building products, exceeded the solicitation of orders (which would have immunized those activities from taxation), where the sales staff's activities relative to its customers' warranty claims were not entirely ancillary to the solicitation of orders and had independent business purposes, and where such activities, taken as a whole, and conducted as they were on a continuing basis throughout the tax period, constituted a nontrivial additional connection to the Commonwealth and were not de minimis [229-231]; moreover, the board's findings of facts were based on substantial evidence [231-233], and its decision did not prevent interstate sellers of goods such as the plaintiff from conducting activities necessary for maintaining customer relations [233].

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*William Hazel* for the taxpayer.

*Thomas A. Barnico,* Assistant Attorney General, for Commissioner of Revenue.

COWIN, J. This is an appeal from a decision of the Appellate Tax Board (board) affirming the denial by the Commissioner of Revenue (commissioner) of applications by Alcoa Building

Products, Inc. (Alcoa), for the abatement of corporate excise taxes assessed for the tax years 1994, 1995, and 1996. Alcoa claims that the board erred in finding that activities engaged in by Alcoa sales representatives in Massachusetts during the relevant time period exceeded the "solicitation of orders," thereby causing Alcoa to forfeit immunity from State taxation under Pub. L. 86-272. Instead, Alcoa argues that its salespeople were merely "[p]assing inquiries and complaints on to home office," which according to 830 Code Mass. Regs. § 63.39.1 (5)(c)(4) (1993), falls within the scope of solicitation. Alcoa also challenges certain factual findings of the board as not supported by substantial evidence, and argues that some of the aforementioned activities were in any case de minimis. We conclude that there was substantial evidence to support the board's findings of fact, and that the board did not err in concluding that Alcoa's activities during the relevant time period exceeded the protection of Pub. L. 86-272. Accordingly, we affirm the decision of the board.

*Background.* We summarize the findings of fact and report of the board. Alcoa, a corporation organized under the laws of Ohio, is in the business of manufacturing and selling building products, including vinyl siding. At no time relevant to this appeal did Alcoa maintain an office, facility, warehouse, or other place of business in Massachusetts. For the tax years 1994-1996, Alcoa timely paid the minimum excise of $456 each year. The commissioner conducted an audit of Alcoa, and after much correspondence between the parties, the commissioner issued to Alcoa a notice of assessment dated December 28, 1999, in which the commissioner assessed additional corporate excises for the tax years at issue.[1] Alcoa filed applications for abatement for each tax year, which were denied by the commissioner. Alcoa subsequently appealed to the board.

During the tax years at issue, Alcoa employed either four or five district sales managers (DSMs), some of whom lived in Massachusetts, and all of whom were assigned sales territories within the State. The DSMs traveled throughout their respective territories, building relationships with customers and soliciting

---

[1]The additional assessments were $51,833, $36,931, and $86,992 for the tax years 1994, 1995, and 1996, respectively.

orders for Alcoa products. The orders themselves were sent out of State to Alcoa headquarters, where they were accepted or rejected. In addition to visiting distributors to solicit orders, DSMs also participated in activities relating to the warranty claims process. DSMs consistently visited construction sites after sales had taken place to investigate the merit of warranty claims. These on-site visits were considered part of their job, a form of "damage control" designed to protect the DSMs' relationships with their customers, and also to promote Alcoa's reputation. During these inspection visits, DSMs often would explain to customers that their problem resulted from incorrect use of the product rather than from any defect. When the product was defective, DSMs, as a courtesy, frequently assisted customers with the filing of the warranty claims by filling out paper work and remitting defective product samples to Alcoa's warranty claims department. DSMs did not have authority to resolve warranty claims, but from 1994 through 1996, Alcoa's DSMs were responsible for "initiating" over one-third of all warranty claims nationwide. Because of the nature of warranty claims, these activities all occurred after the sale of the product in question. It is the characterization of these warranty-related activities that is at issue in this case.

The board determined these activities of the DSMs had "independent business purposes" beyond the "solicitation of orders," thereby exceeding the protection of Pub. L. 86-272 and exposing Alcoa to excise taxation by the Commonwealth. Alcoa appealed the board's ruling and we granted its application for direct appellate review.

*Discussion.* A brief review of the State excise tax and the limitations imposed on it by Federal law is helpful in understanding the underlying dispute. General Laws c. 63, § 39, imposes an excise on "every foreign corporation . . . actually doing business in the commonwealth." However, this taxing authority is limited by Congress's power to regulate interstate commerce pursuant to the commerce clause of the United States Constitution. *Kennametal, Inc.* v. *Commissioner of Revenue*, 426 Mass. 39, 41 (1997), cert. denied, 523 U.S. 1059 (1998). Congress, in 1959, enacted 15 U.S.C. §§ 381-384, also known as Pub. L. 86-272. See *id.* at 39. The statute was

promulgated in part to "allay the apprehension of businessmen that 'mere solicitation' would subject them to state taxation." *Heublein, Inc.* v. *South Carolina Tax Comm'n,* 409 U.S. 275, 280 (1972). It establishes a "minimum standard" for the imposition of a State net income tax based on solicitation of interstate sales, *Wisconsin Dep't of Revenue* v. *William Wrigley, Jr., Co.,* 505 U.S. 214, 222 (1992) (*Wrigley*), and "expressly restricts the authority of a State to impose an income tax on foreign corporations whose business within the State consists solely of 'the solicitation of orders . . . for sales of tangible personal property, which orders are [then] sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State.' " *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 41, quoting Pub. L. 86-272. Public Law 86-272, however, does not define the term "solicitation of orders." *Kennametal, Inc.* v. *Commissioner of Revenue, supra.*

In *Wrigley, supra* at 228, the United States Supreme Court concluded that "solicitation of orders" is "more than what is strictly *essential* to making requests for purchases" (emphasis in original). Thus, some activities conducted by salespeople might go beyond verbally or impliedly requesting a customer to make purchases, *id.* at 223, but still be protected activities under Pub. L. 86-272. *Id.* at 225.

Where the *Wrigley* Court drew a line, however, was "between those activities that are entirely ancillary to requests for purchases — those that serve no independent business function apart from their connection to the soliciting of orders — and those activities that the company would have reason to engage in anyway but chooses to allocate to its in-state sales force." *Id.* at 228-229. Thus, providing the sales force with company vehicles or free samples would be part of the "solicitation of orders," as there is no independent business reason for those activities. *Id.* at 229. By contrast, involving salespeople in "repair and servicing may help to *increase* purchases; but it is not ancillary to *requesting purchases,* and cannot be converted into 'solicitation' by merely being assigned to salesmen" (emphasis in original). *Id.* While the Court refused to hold that all postsale activities are per se not part of the solicitation of orders, it did note that "[a]ctivities that take place after a sale

will ordinarily not be entirely ancillary" to the solicitation of orders. *Id.* at 230. Wrigley sales staff's replacement of stale chewing gum, supplying gum through "agency stock checks," rental of storage space, and storage of gum in-State were not entirely ancillary to the solicitation of orders because they served separate business purposes. *Id.* at 232-233. The replacement of stale gum, for example, would increase general sales, but "Wrigley would wish to attend to the replacement of spoiled product whether or not it employed a sales force," and therefore it was not merely facilitating the salesmen's solicitation of orders. *Id.* at 233. On the other hand, Wrigley's recruitment and training of sales staff, as well as the in-State sales staff's periodic intervention in credit disputes between customers and the Wrigley home office, were entirely ancillary because they served no function but to facilitate the solicitation of orders. *Id.* at 234.

This court first addressed the definition of "solicitation of orders" in the *Kennametal* case. We concluded that "no bright line . . . distinguish[es] those activities that are entirely ancillary to the solicitation of orders from those that also serve an independent business function." *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 45. Instead, the activities "occur along a continuum" and "must be considered on an individual basis." *Id.* The Kennametal sales force in Massachusetts, which consisted primarily of engineers, *id.* at 40, used samples to test the performance of products, prepared reports based on those tests, prepared inventory analyses, and often made in-plant presentations. *Id.* at 44-45. We concluded that these activities were not entirely ancillary to the solicitation of orders because they served independent business purposes, *id.* at 45, that is, even if Kennametal had no sales force in Massachusetts, it had other reasons to provide these services. Under *Wrigley,* although these activities may have increased general sales, they did not "facilitate the actual solicitation of orders." *Id.* See *Wrigley, supra* at 228; *Amgen Inc.* v. *Commissioner of Revenue,* 427 Mass. 357, 362 (1998).[2] The *Wrigley* Court makes it clear that even when considering a business activity that is a "promotional

---

[2]We also noted that the frequent resolution of customer complaints concerning the use of Kennametal products was not ancillary to the solicitation of orders by the sales staff, and distinguishable from the infrequent presale

necessity" (for example advertising, or replacing spoiled product) without which solicitation realistically could not be consummated, the activity in question is not protected by Pub. L. 86-272 because it is "quite separate from requesting orders." *Wrigley, supra* at 233. That is, Pub. L. 86-272 protects the mechanics of solicitation but not all activities that may happen to make solicitation more successful.

A decision of the board will not be reversed or modified if it is based on a correct application of the law and if it is based on substantial evidence. See *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 43, and cases cited. We consider whether the evidence is sufficient to support the board's findings. See *id.,* and cases cited. However, our review of the sufficiency of the evidence is limited to "whether a contrary conclusion is not merely a possible but a necessary inference from the findings." *Id.,* quoting *Commissioner of Revenue* v. *Houghton Mifflin Co.,* 423 Mass. 42, 43 (1996).

The board applied the appropriate legal standard, and reasonably could conclude that the activities of the Alcoa sales staff exceeded the solicitation of orders. The board found that the activities of Alcoa's DSMs relative to warranty claims were not entirely ancillary to the solicitation of orders, and instead had independent business purposes. These purposes included increasing general sales of Alcoa's products and the enhancement of Alcoa's general reputation among buyers. DSM involvement in warranty claims may also have helped to decrease the number of direct calls to Alcoa's warranty claims office. See *Amgen Inc.* v. *Commissioner of Revenue, supra* at 362. While these activities may have enhanced the reputation of the company and increased purchases of Alcoa products generally, they were not entirely ancillary to the sales staff's job of soliciting purchases. See *Wrigley, supra* at 229; *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 42. Alcoa would have reason to engage in the resolution of warranty claims irrespective of

resolution of credit disputes which the *Wrigley* Court found to be ancillary. *Kennametal, Inc.* v. *Commissioner of Revenue,* 426 Mass. 39, 45-46 n.9 (1997), cert. denied, 523 U.S. 1059 (1998).

the presence of an in-State sales staff. See *Wrigley, supra* at 228-229.[3]

It is true, as Alcoa claims, that 830 Code Mass. Regs. § 63.39.1(5)(c)(4) provides that "[p]assing inquiries and complaints on to home office" is among the "activities that ordinarily fall within the scope of 'solicitation' under Pub. L. 86-272." The board's findings of fact, however, indicate that DSM activities exceeded this description. Based on the board's findings, other provisions of the regulations are probably more apt, for instance "handling customer complaints (other than by referral to home office)," 830 Code Mass. Regs. § 63.39.1(5)(d)(7), which the regulation describes as falling outside the scope of solicitation.

Alcoa contends that this case is distinguishable from our *Kennametal* and *Amgen* decisions, because the DSMs did not possess or impart complicated information about Alcoa's products. Alcoa concedes that the DSMs did at times convey information about the company's products, but insists that the DSMs were "classic sales staff" without technical expertise. This would distinguish this case, the argument goes, from the qualifications and activities of the *Kennametal* engineer-salespeople and the nurses who accompanied Amgen sales representatives on their rounds, reviewing patient charts and answering questions about Amgen's medical products, and who also gave programs on Amgen products to health groups. See *Amgen Inc.* v. *Commissioner of Revenue, supra* at 358-359. This argument misses the point. The holdings in these cases were not predicated on the technical nature of the activity involved, but on whether that activity was or was not entirely ancillary to the solicitation of orders. See *Amgen Inc.* v. *Commissioner of Revenue, supra* at 361-362; *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 44. We simply held that the board could reasonably conclude that the activities of these particular engineer-salesmen and nurses served independent business purposes, and were not merely part of the solicitation

[3]During his testimony before the board, Alcoa's regional sales manager (and a former DSM) Terrance Costello admitted that if it were not for the DSM activities with regard to warranty issues, Alcoa ultimately may have had to send "some other employee" to Massachusetts to follow up on those claims.

process. *Amgen Inc.* v. *Commissioner of Revenue, supra* at 362. *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 45.

Alcoa argues alternatively that if we conclude that the activities of the DSMs in relation to warranty claims were not immune from State taxation under Pub. L. 86-272, we should find that some or all of these activities were de minimis. The *Wrigley* Court recognized an exception for de minimis activities, to avoid results that would render "a company liable for hundreds of thousands of dollars in taxes if one of its salesmen sells a 10-cent item in state." *Wrigley, supra* at 231. To qualify for the de minimis exception, the nonimmune activities of the company must be analyzed as a whole (and not individually), *Kennametal, Inc.* v. *Commissioner of Revenue, supra* at 42 n.5, to determine whether they constitute a "nontrivial additional connection with the State," *Wrigley, supra* at 235. In *Wrigley*, although the activities that were not ancillary to the solicitation of orders accounted for only 0.00007 per cent of Wrigley's annual sales in Wisconsin, and thus were not relatively large in magnitude, they were conducted "as a matter of regular company policy, on a continuing basis" and were not de minimis. *Id.*

In this case, the board found that warranty claims acted on by Alcoa's DSMs constituted more than one-third of warranty claims nationwide between 1994 and 1996. Throughout the same period, DSMs in Massachusetts made regular visits to warranty claim sites,[4] assisted customers in filling out forms, and remitted samples to the Alcoa warranty claims department. The board could reasonably conclude that these activities, taken as a whole, conducted as they were on a continuing basis throughout the tax period, constituted a nontrivial additional connection to the Commonwealth and were not de minimis.

Alcoa also urges us to reverse the decision of the board because two of the board's findings of fact were not based on substantial evidence. First, Alcoa claims that the finding that the DSMs remitted samples of Alcoa products to the warranty claims department is not based on substantial evidence. However, in an August 28, 1998, letter to the commissioner,

---

[4]DSMs made an average of 1.73, 1.60, and 1.31 visits per month to Massachusetts warranty claim sites in 1994, 1995, and 1996, respectively.

Carol L. Pawlos, tax accountant for Alcoa, wrote that the DSM "inspects the home [and] [i]f the problem is caused by fading, [the DSM] will send a sample back to the warranty claims department for evaluation." Pawlos, although she had no actual knowledge of the claims process, testified that her information came directly from Dan Mitman, an accounting "contact" at Alcoa, and later from Ricardo Gibellino, the regional sales manager in charge of the Massachusetts DSMs from 1994 through 1996. Gibellino testified that when a DSM visited certain sites connected to warranty claims, "he just has to send [a sample of the defective product] back." Although Alcoa, through counsel, has subsequently labeled Pawlos's letter as "not completely accurate," and "inherently unreliable,"[5] and although Gibellino's testimony was not as clear as it could have been, based on the record before us, we cannot say that "a contrary conclusion is not merely a possible but a necessary inference from the findings" of the board. *Kennametal Inc.* v. *Commissioner of Revenue, supra* at 43, quoting *Commissioner of Revenue* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43 (1996).

Second, Alcoa maintains that the board's use of the phrase " 'initiation' of warranty claims" to describe DSM activities is not based on substantial evidence. Alcoa concedes that the DSMs responded to customer inquiries and complaints, but insists that this passive role cannot be characterized as "initiation." It is unnecessary for us to resolve this essentially semantic argument. In an absolute sense, Alcoa is correct that these claims, like almost all warranty claims in every industry, are initially made by customers, not employees of the manufacturer. The same could be said for service calls, installation requests, and countless other business activities. This passive nature alone, however, does not make the warranty process

---

[5]Although Pawlos testified that some of the information she provided in her initial correspondence with the commissioner was less than accurate, that information primarily related to Alcoa's video program training sessions, which is not an issue in this appeal. Pawlos testified that the incorrect information in this correspondence was "corrected" by Alcoa's answers to the commissioner's interrogatories and a letter from Alcoa's attorneys dated April 4, 2001. Neither explicitly corrects the August 28, 1998, letter on the issue of remitting samples, except for a general denial that DSMs performed any "warranty work."

entirely ancillary to the solicitation of orders when the activities in question serve independent business purposes. The record shows, and counsel for Alcoa conceded during oral argument, that it was Alcoa's representative who first characterized certain warranty claims as having been initiated by the DSMs. In any event, there is substantial evidence in the record that these activities, however labeled, did in fact occur.[6]

Finally, Alcoa cautions that if the board's opinion stands, there will be "precious little room for interstate sellers of goods to deploy solicitors in the Commonwealth" without exposing the seller to excise taxation. The warranty-related activities in question, Alcoa argues, are "bound up" in the solicitation process and necessary for maintaining customer relations in this particular industry. Nothing prevents Alcoa from providing any service it wishes to its customers, except its desire to avoid the taxes associated with "doing business" in the Commonwealth. It may be true that the seller of a product that eventually becomes attached to a home or building cannot leave the entire warranty process to customers, as would more easily be the case if the product were a small appliance or an article of clothing. But the *Wrigley* Court is quite clear that an industry-by-industry approach is not to be applied, as it would "render the limitations of [Pub. L. 86-272] toothless, permitting 'solicitation of orders' to be whatever a particular industry wants its salesmen to do." *Wrigley, supra* at 227.

The decision of the board is affirmed.

*So ordered.*

---

[6]In addition, the language in *Kennametal, Inc.* v. *Commissioner of Revenue*, 426 Mass. 39 (1997), and *Amgen Inc.* v. *Commissioner of Revenue*, 427 Mass. 357 (1998), lends no support to the notion that the court would have decided those cases differently if it could have been shown that the activities in question were conducted only in response to customer requests. The only post-*Wrigley* case we can find that hints at such a distinction is *Linear Films, Inc.*, v. *State ex rel. Okla. Tax Comm'n*, 876 P.2d 301 (Okla. Ct. App. 1994), cited by neither party here, which conjectures that "trouble shooting," as opposed to taking responsibility for correcting problems, would be considered protected by Pub. L. 86-272 in other States. This case was decided by another State's intermediate appellate court, and we are not persuaded by its reasoning.