IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Corporation Excise Tax

SANTA FE NATURAL TOBACCO )
COMPANY, )
)
        Plaintiff, ) TC-MD 170251G
)
    v. )
) **ORDER DENYING PLAINTIFF'S**
DEPARTMENT OF REVENUE, ) **MOTION FOR SUMMARY**
State of Oregon, ) **JUDGMENT AND GRANTING**
) **DEFENDANT'S MOTION FOR**
        Defendant. ) **PARTIAL SUMMARY JUDGMENT**

      This matter came before the court on the Motion for Summary Judgment of Plaintiff

(taxpayer) and the motion for partial summary judgment of Defendant (the department).[1] At

issue is whether, given its Oregon activities, taxpayer qualifies for immunity from Oregon

taxation under 15 USC sections 381 to 384 ("Public Law 86-272"). Taxpayer appealed from

notices of assessment for tax years ending December 31, 2010, December 31, 2011, December

31, 2012, and December 31, 2013.

## I. STATEMENT OF FACTS

      During the years at issue, taxpayer manufactured, marketed, and distributed "premium

brand" cigarettes and roll-your-own tobacco products (collectively "cigarettes"). (Stip Facts at ¶

2; Ptf's Resp at 4). Taxpayer was based in New Mexico and sold its cigarettes throughout the

United States. (Stip Facts at ¶¶ 1,3.)

      Taxpayer's distribution method in Oregon was to sell cigarettes to in-state wholesalers

(Oregon wholesalers), who then sold them to in-state retailers (Oregon retailers), who then sold

---

[1] The department's Cross-Motion for Summary Judgment is treated as a motion for partial summary judgment because taxpayer in its motion reserved the right to pursue additional claims in its Complaint at a later date.

them to the people who presumably smoked them. (Stip Facts at ¶¶ 7, 14, 15, 39.) There were exceptions; taxpayer sold some cigarettes directly to Oregon retailers in 2010, and some Oregon retailers purchased cigarettes from out-of-state wholesalers. (*Id*. at ¶¶ 9–10.) The Oregon wholesalers were unrelated to taxpayer by ownership or common control, and they did not sell to retailers on behalf of taxpayer. (*Id*. at ¶¶ 15–17.) All orders received by taxpayer from its Oregon customers were sent outside Oregon for approval or rejection, and taxpayer fulfilled all approved orders by shipment from outside Oregon. (*Id*. at ¶¶ 5–6.)

Although taxpayer's in-state sales were generally made to Oregon wholesalers, it promoted its cigarettes directly to Oregon retailers in two pertinent ways. First, it provided the retailers with a "100% Product Guarantee," under which retailers were entitled to return non-saleable cigarettes to wholesalers (or, until July 2011, directly to taxpayer) for replacement or refund. (Stip Facts at ¶ 11, Stip Exs 1–5.) Second, taxpayer employed trade representatives who visited retailers and solicited them to carry and sell taxpayer's cigarettes. (Stip Facts at ¶ 14.) Taxpayer's trade representatives could and did take orders from retailers during their visits, faxing or otherwise forwarding these so-called "pre-book orders" to wholesalers, who fulfilled the orders from their own inventories and billed the retailers. (*Id*. at ¶¶ 34–36, 39.)

Importantly, wholesalers' handling of cigarette returns and pre-book orders was regulated by contract with taxpayer. During each of the years in question, taxpayer entered into a "Distributor Incentive Program" (DIP) agreement with each of the six or seven Oregon wholesalers. (Stip Facts at ¶¶ 15–17.) Pursuant to those agreements, the wholesalers were required to "allow their retailers to return any [of taxpayer's] product to them regardless of reason" and to "[a]ccept and process pre-book orders initiated by [taxpayer] on behalf of their retail accounts." (*Id*. at ¶ 19, Stip Exs 8 at 9, 7 at 11; *accord* Stip Ex 6 at 1.) In return,

wholesalers who complied with the DIP agreement rules received cash payments and credits from taxpayer. (Stip Exs 8 at 10, 7 at 8, 6 at 2.) Through June 2011, DIP-compliant wholesalers received payments of $0.20 per cigarette carton purchased and $0.40 per additional cigarette carton purchased beyond the previous year's purchases. (Stip Facts at ¶ 15, Stip Ex 6 at 2.) Beginning July 2011, DIP-compliant wholesalers received $0.50 per purchased carton in payments and credits. (Stip Exs 8 at 10, 7 at 8.) Also beginning July 2011, Oregon wholesalers could not purchase taxpayer's cigarettes without entering into a DIP agreement. (Stip Facts at ¶ 18.)

The parties agree that the 2013 statistics for cigarette returns from retailers to wholesalers are representative of each of the years at issue. (Stip Facts at ¶ 30.) In that year, Oregon wholesalers sold 764,464 cartons to Oregon retailers and accepted returns of 1,993 cartons, meaning that the ratio of returns to sales was 0.261 percent. (*Id*.) During that same period, taxpayer accepted returns of 503 cartons from Oregon wholesalers, but did not maintain records of whether any of those returned cartons had previously been returned to the wholesalers by retailers. (*Id*. at ¶¶ 31–32.)

Taxpayer filed 2010, 2011, 2012, and 2013 Oregon corporation excise tax returns, reporting no Oregon income and including a statement that its activities in Oregon were limited to the solicitation of sales and therefore protected by Public Law 86-272. (Stip Exs 11–14.) The department assessed deficiencies to taxpayer for each of those years by notices dated May 5 and May 8, 2017. (Stip Ex 17.) On June 6 and June 9, 2017, the department issued taxpayer Notices and Demands for Payment for each of those years. (Stip Ex 18.)

///

///

## II. ANALYSIS

The primary issue is whether, due to the nature of taxpayer's activities, Public Law 86-272 prevents Oregon from imposing its corporation excise tax on taxpayer. The department alleges that two activities disqualified taxpayer from immunity under Public Law 86-272: (1) acceptance of cigarette returns from retailers pursuant to DIP agreements, and (2) placement of pre-book orders with wholesalers required by DIP agreements to accept and process them. The court will first determine whether either of those activities placed taxpayer outside the protection of Public Law 86-272.

Additional issues briefed are:

    (1)    Whether the department properly imposed the substantial understatement of income penalty under ORS 314.402;

    (2)    If so, whether the department improperly declined to waive that penalty; and

    (3)    Whether the department's Notices and Demands for Payment should be canceled as having been issued during the pendency of taxpayer's appeal in violation of ORS 305.565.[2]

A.    *Oregon's Corporation Excise Tax and Public Law 86-272*

Oregon's corporation excise tax is imposed on each corporation doing business within this state "according to or measured by its Oregon taxable income[.]" ORS 317.070.[3] The

---

[2] A footnote to taxpayer's motion for summary judgment states: "[Taxpayer] reserves the right to pursue all other claims asserted in its Complaint at a later date (including claims that [taxpayer] is entitled to alternative apportionment under Oregon law and that the Department's position here is unconstitutional)." (Ptf's Mot Summ J at 1.)

The department has conceded one of the two claims asserted by taxpayer but not briefed—that the department's Notices and Demands for Payment should "be stayed pending appeal pursuant to ORS 305.565." (Compl at 11; Def's Mot Summ J at 20 n 6.) Taxpayer's remaining claim challenged the amount of its income apportioned to Oregon under ORS 314.667 and the Oregon and United States Constitutions. (Compl at 7–8.)

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2009. The relevant provisions did not substantively change throughout the years at issue.

parties do not dispute that taxpayer is a corporation doing business in Oregon. Therefore, Oregon's corporation excise tax will apply unless taxpayer is protected by Public Law 86-272.

Public Law 86-272 prevents any state from imposing a "net income tax" on out-of-state taxpayers that generally limit their in-state business activities to solicitation. 15 USC § 381. The term *net income tax* includes Oregon's corporation excise tax, which is a tax measured by net income. *See* 15 USC § 383; *e.g*., *Ann Sacks Tile & Stone, Inc. v. Dept. of Rev.* (*Ann Sacks*), 20 OTR 377 (2011). The relevant portion of Public Law 86-272 is as follows:

> "(a) *Minimum standards*. No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
>
> > "(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
> >
> > "(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).
>
> "* * * * *
>
> "(c) *Sales or solicitation of orders for sales by independent contractors.* For purposes of subsection (a) of this section, a person shall not be considered to have engaged in business activities within a State during any taxable year merely by reason of sales in such State, or the solicitation of orders for sales in such State, of tangible personal property on behalf of such person by one or more independent contractors, or by reason of the maintenance, of an office in such State by one or more independent contractors whose activities on behalf of such person in such State consist solely of making sales, or soliciting orders for sales, of tangible personal property."

/ / /

/ / /

"(d) *Definitions.* For purposes of this section—

"(1) the term "independent contractor" means a commission agent, broker, or other independent contractor who is engaged in selling, or soliciting orders for the sale of, tangible personal property for more than one principal and who holds himself out as such in the regular course of his business activities; and

"(2) the term "representative" does not include an independent contractor."

15 USC § 381.

Public Law 86-272 therefore shields from state taxation those out-of-state taxpayers who merely solicit orders for sales of tangible goods from themselves or from a "prospective customer" of theirs—typically, an in-state wholesaler. 15 USC § 381(a). Out-of-state taxpayers may also engage independent contractors to solicit and make sales on their behalf. 15 USC § 381(c). In-state independent contractors may perform two, and only two, additional activities forbidden to their out-of-state principals: they may make actual sales and they may maintain offices in the state. *Ann Sacks*, 20 OTR at 382–83.

Taxpayers and their representatives, as opposed to their independent contractors, are limited to the solicitation of orders. "Solicitation of orders" includes implicit as well as explicit proposals, and also includes activities "that serve no independent business function apart from their connection to the soliciting of orders"—such as providing cars and stocks of free samples to sales representatives. *Wisconsin Dept. of Rev. v. Wrigley Co.* (*Wrigley*), 505 US 214, 228–29, 112 S Ct 2447, 120 L Ed 2d 174 (1992). By contrast, "activities that the company would have reason to engage in anyway"—such as performing repair work and replacing spoiled product— are not protected, even if those activities are carried out by an in-state sales force. *Id.* at 229, 233; *see also Chester A. Asher, Inc. v. Dir., Div. of Taxation*, 22 NJ Tax 582, 596 (2006) (acceptance of returns by company's delivery drivers not ancillary to solicitation). Such

activities may "facilitate sales," in the broad sense that customers are more likely to buy a product of reliable quality that the seller stands behind, but they do not facilitate the "requesting of sales." *See Wrigley*, 505 US at 233.

In the present case, the department alleges that either of two of taxpayer's activities suffices to place it outside the protection of Public Law 86-272: the acceptance of returns by taxpayer's wholesalers and the forwarding of pre-book orders to the wholesalers by taxpayer's representatives.

B.     *Returns to Wholesalers*

A person loses immunity under Public Law 86-272 where disqualifying business activities are performed in-state "by or on behalf of such person." 15 USC § 381(a). Here, there is no dispute that accepting returns is the kind of business activity that could cost a company its immunity because there is a business reason for accepting returns that is independent of soliciting orders. *See Wrigley*, 505 US at 233 (removing and replacing stale gum not ancillary to requesting sales); *Chester A. Asher, Inc*, 22 NJ Tax at 596 (accepting returns not ancillary to requesting sales). Because the Oregon wholesalers accepted returns, their activity would disqualify taxpayer from immunity if it was done "on behalf of" taxpayer. 15 USC § 381(a).

The first question, then, is how to recognize someone who acts "on behalf of" an out-of-state taxpayer. Public Law 86-272 does not purport to identify all such categories of persons. *Ann Sacks*, 20 OTR at 385 (Public Law 86-272 "does not affirmatively define the activities that expose taxpayers to taxation, but rather describes certain activities that do not expose taxpayers to taxation"). However, Public Law 86-272 does identify representatives and independent contractors as the two categories of persons whose actions on behalf of out-of-state principals may be consistent with immunity from taxation, provided they are kept within prescribed limits.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*See id*. at 383. If actions taken on behalf of an out-of-state taxpayer by its representatives and independent contractors are not within the prescribed limits, that taxpayer may lose the protection of Public Law 86-272. It therefore makes sense to begin by asking whether an entity performing an activity outside the limits of Public Law 86-272 is a representative or an independent contractor.

Oregon courts have previously had occasion to determine whether a person is a representative, looking to the law of agency and, in particular, asking who has the right to control the manner of accomplishing the result. *Herff Jones v. State Tax Comm.*, 247 Or 404, 409, 430 P2d 998 (1967); *Estee Lauder Services v. Dept. of Rev.*, 16 OTR-MD 279, 287–88 (2000). In the present case, however, no party contends that the Oregon wholesalers were taxpayer's representatives for purposes of Public Law 86-272. (Def's Resp at 2 n 2.) The question thus becomes whether they were taxpayer's independent contractors.

Public Law 86-272's definition of *independent contractor* applies to those engaged in "selling, or soliciting orders for the sale of, tangible personal property for more than one principal."[4] The department makes no argument opposing taxpayer's contention that the Oregon wholesalers did not meet Public Law 86-272's definition of an independent contractor, acknowledging that they "did not solicit orders for, or sell" cigarettes on behalf of taxpayer. (Stip Facts at ¶¶ 15–17; *see* Def's Resp at 3.) It is thus undisputed that the wholesalers were not independent contractors under the definition found in Public Law 86-272.

/ / /

---

[4] 15 USC section 381(d)(1) states: "[T]he term 'independent contractor' means a commission agent, broker, or other independent contractor who is engaged in selling, or soliciting orders for the sale of, tangible personal property for more than one principal and who holds himself out as such in the regular course of his business activities[.]"

Nevertheless, someone who is not an independent contractor under Public Law 86-272 may be an independent contractor under state law. *See Ann Sacks*, 20 OTR at 382.[5] Under ORS 670.600(2), an independent contractor "provides services for remuneration" while engaging in an independently established business, is not subject to control over the manner and means of providing services, and is responsible for obtaining relevant licenses.[6] *See also* OAR 150-670-0010(2)(a). The genus of that definition—one who "provides services for remuneration"—is broader than Public Law 86-272's in that it allows for provision of services other than sales and solicitation. Thus, the actions of a state-law independent contractor on behalf of its principal could cause that principal to lose its immunity under Public Law 86-272.

Here, there is no dispute that the Oregon wholesalers were independent businesses responsible for their own licenses and not subject to taxpayer's control as to their means and manner of accepting returns. The question of whether they were independent contractors depends on whether accepting those returns was providing a service for remuneration.

/ / /

---

[5] The court in *Ann Sacks* did not apply a definition of *independent contractor* because it assumed the entities performing the activity under consideration were independent contractors under "any relevant measure"—meaning state law or Public Law 86-272. *Ann Sacks*, 20 OTR at 382. The court made that assumption even though the entities' status as independent contractors was "by no means free from doubt" because that was the status for which the party to whom its ruling was adverse had contended. *Id.* at 382–83.

[6] ORS 670.600(2) states: "As used in ORS chapters 316, 656, 657, 671 and 701, 'independent contractor' means a person who provides services for remuneration and who, in the provision of the services:

"(a) Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b) Except as provided in subsection (4) of this section, is customarily engaged in an independently established business;

"(c) Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and

"(d) Is responsible for obtaining other licenses or certificates necessary to provide the services."

Remuneration occurs when one party has "pa[id] an equivalent" to another for a service, loss, or expense. *Webster's Third New Int'l Dictionary* 1921 (unabridged ed 2002), *s.v.* "remunerate." That definition implies that a party receiving only a token payment for a service has not been remunerated because there is no equivalence between the service and the payment. Given that a party may perform a service for multiple reasons, the concept of remuneration is useful for distinguishing where a party acts primarily for its own purposes from where a party acts primarily on behalf of a principal.

In this case, the stipulated facts show that DIP-compliant Oregon wholesalers were entitled to receive cash payments and credits from taxpayer on a per-carton basis. Oregon wholesalers accepted approximately 2,000 returned cartons from retailers during each of the years at issue. At the same time, Oregon wholesalers sold approximately 760,000 cartons to Oregon retailers each year, presumably purchasing a comparable number from taxpayer. At $0.50 in DIP incentives per carton, taxpayer thus paid approximately $380,000 to Oregon wholesalers each year, an amount equal to $140 per carton returned, in exchange for compliance with DIP provisions such as accepting returns. Through June 2011, wholesalers earned $0.20 per carton for compliance with the DIP agreement plus a $0.40-per-new-carton incentive for increasing sales. At $0.20 per carton, taxpayer's baseline DIP payments in 2010 amounted to $152,000—$76 per returned carton—irrespective of incentives for new sales. While Oregon wholesalers had obligations under the DIP agreements besides accepting returns—such as processing pre-book orders, making weekly reports, and maintaining inventory levels—taxpayer made more than token payments to Oregon wholesalers for their services.

Taxpayer argues that the wholesalers accepted returns for their own benefit, not taxpayer's, as shown by the fact that the returns were from the wholesalers' own customers and

were placed in their own stock. In taxpayer's view, the returns provisions in the DIP agreements were "simply an imposition of a best practice," comparable to an out-of-state car seller requiring dealerships to maintain clean showrooms. The term "best practice" implies that taxpayer views accepting returns as purely a means to a common end shared by taxpayer and the wholesalers. Taxpayer's argument is therefore that the DIP agreements coordinated a strategy for accomplishing a goal beneficial to both taxpayer and wholesalers: increasing sales of taxpayer's products.

However, taxpayer's argument is undercut by its payments to the wholesalers under the DIP agreements; if the returns policy was equally in the wholesalers' interest, why did taxpayer pay them? In the absence of evidence to the contrary, payments of $76 to $140 per returned carton appear to be remuneration for the wholesalers' trouble, particularly given that the returned cartons could either be resold or returned to taxpayer for a refund. Furthermore, the stipulated facts do not show that the wholesalers' interest in increasing sales was the same as taxpayer's. If the wholesalers sold products from taxpayer's competitors, it might be a matter of indifference to them whether taxpayer's market share increased. Borrowing taxpayer's car-showroom analogy, in that case the out-of-state seller would not be requiring dealers to provide a clean showroom— a benefit to all models sold at the dealership—but rather free car washes to purchasers of the seller's own models. An independent business interest in accepting returns cannot be presumed where the wholesalers are entitled to significant payments for performing the service.

Because accepting returns was a service the wholesalers performed for remuneration, they acted as taxpayer's state-law independent contractors in so doing. *See* ORS 670.600(2). As independent contractors, the wholesalers acted on behalf of taxpayer when they accepted returns.

/ / /

Taxpayer contends that the wholesaler returns were *de minimus* because "such returns represented only 0.261 percent of the Oregon Wholesalers' sales during the representative time period." (Ptf's Mot Summ J at 23.) Taxpayer points out that, unlike the taxpayer in *Wrigley*, it maintained no in-state inventory. (*Id*. at 22–23.)

In *Wrigley*, the taxpayer argued that its in-state sales were *de minimus* activity because they accounted for only 0.00007% of its total sales to the state. 505 US at 235. The Court declined to consider in-state sales in isolation, holding that in combination with maintaining an in-state inventory and exchanging stale gum "as a matter of regular company policy, on a continuing basis," the taxpayer's unprotected activities "constituted a nontrivial additional connection with the State" even though "the relative magnitude of these activities was not large." *Id*. Under *Wrigley*, therefore, even activities that are small in number or magnitude will not be held *de minimus* if they are part of a regular, ongoing company policy.

Here, taxpayer's policy of paying wholesalers to accept returns was of long standing and was formalized in the DIP agreements. In terms of magnitude, the proportion of in-state returns was not high, although it was over a thousand times the proportion of in-state sales in *Wrigley*. However, the procedure of making returns to wholesalers was integral to taxpayer's marketing strategy through its 100% guarantee. Ensuring that returns would be accepted in-state was taxpayer's regular policy. It was therefore a nontrivial additional connection to Oregon; taxpayer's activities in Oregon were not *de minimus*. Because taxpayer did not limit activities performed on its behalf to those specified in Public Law 86–272, it loses the benefit of that statute's protection.

/ / /

/ / /

C.      *Pre-Book Orders*

Because the wholesalers' acceptance of returns causes taxpayer to lose state-tax immunity, the court does not reach the issue of whether taxpayer's forwarding of pre-book orders has a similar effect.

D.      *Substantial Understatement Penalty*

During the tax years at issue, C corporations that understated their taxable income by over $25,000 were subject to the substantial understatement penalty. ORS 314.402(2)(b) (2009).[7] The understatement is the difference between the correct taxable income and the reported taxable income, not including any amount attributable to:

> "(A) The tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment; or

> "(B) Any item with respect to which:

>> "(i) The relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return; and

>> "(ii) There is a reasonable basis for the tax treatment of the item by the taxpayer."

ORS 314.402(4)(b). Thus, the amount of an understatement is reduced by items for which there was "substantial authority" and by adequately disclosed items for which there was "reasonable basis."

The terms *substantial authority* and *reasonable basis* represent standards of proof along a continuum ranging from "not frivolous or not patently improper" to "more likely than not." Treas Reg §§ 1.6662–3(b)(3), 1.6662–4(d)(2).[8] "The substantial authority standard is less

---

[7] Subsequent to the years at issue here, ORS 314.402 was amended so that the penalty is imposed for understatement of "net tax" rather than "taxable income." 2015 Or Laws ch 32, § 1,

[8] The department's regulations adopt the definitions of the terms given in the federal Treasury Regulations

stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662–3(b)(3)." Treas Reg § 1.6662–4(d)(2). Reasonable basis is a "significantly higher [standard] than not frivolous or not patently improper." Treas Reg § 1.6662–3(b)(3). It is "not satisfied by a return position that is merely arguable or that is merely a colorable claim." *Id.*

Both *substantial authority* and *reasonable basis* denote objective standards; they can be met only if identifiable legal authority supports the taxpayer's treatment of a disallowed item. *See* Treas Reg §§ 1.6662–4(d)(2); 1.6662–3(b)(3). The standards may be met where a taxpayer has relied on an authoritative interpretation of the law, such as a factually on-point case or revenue ruling not outweighed by countervailing cases or rulings. Treas Reg § 1.6662–4(d)(3)(ii); *e.g.*, *Campbell v. Comm'r*, 134 TC 20, 32 (2010) (finding reasonable basis for tax treatment of attorney contingency fee payments where petitioner relied on factually similar case from another jurisdiction with similar lien laws). Absent an authoritative interpretation, substantial authority or reasonable basis may be found where the taxpayer provides a well-reasoned construction of a statute. Treas Reg § 1.6662–4(d)(3)(ii).

Here, the department concedes that taxpayer adequately disclosed the relevant facts affecting its treatment of its reported taxable income. Therefore, a showing that taxpayer had a reasonable basis for its position would suffice to lower its understatement.

Taxpayer's brief on the issue of wholesaler returns argued three points: (1) that the wholesalers were not taxpayer's representatives; (2) that the wholesalers did not meet the definition of *independent contractor* found in Public Law 86-272; and (3) that the wholesalers

cited. OAR 150-314.402(4)(b)(1) (Dec 26, 2008); *cf.* OAR 150-314-0209(1).

did not accept returns on behalf of taxpayer. The department did not dispute the first two points. With respect to the third point, taxpayer cited only three authorities: *Ann Sacks*, 20 OTR at 377, *Cheng Shin Rubber USA v. Dept. of Rev.*, TC-MD 150268D, WL 1194517 (Or Tax M Div Mar 31, 2017), and, in its response, UCC section 2-314.

Taxpayer cites *Ann Sacks* for the proposition that Public Law 86-272 recognizes only three ways an out-of-state person may conduct activities in a state: directly, through a representative, or through an independent contractor. 20 OTR at 383. Taxpayer argues that its wholesalers fall into none of those categories. However, taxpayer's analysis assumes that an independent contractor must meet the definition found in Public Law 86-272 to act on behalf of another. There is no basis for that assumption in *Ann Sacks*, which contemplates the possibility of action on behalf of another by a state-law independent contractor. *See id*. at 382. Furthermore, the "three ways" identified in *Ann Sacks* are only the ways an out-of-state person may act within the protection of Public Law 86-272. The court in *Ann Sacks* acknowledged that Public Law 86-272 does not limit the ways a person may act outside its protection. *Id*. at 385. *Ann Sacks* does not provide a reasonable basis for taxpayer's position.

Taxpayer does not rely on *Cheng Shin* but distinguishes it, and rightly so. In *Cheng Shin*, there was "no real question" about the independent contractor relationship and there was a significant issue as to whether the independent contractor's activity was disqualifying. 2017 WL 1194517 at \*5–\*6. By contrast, in this case there was no dispute that the activity at issue was disqualifying; the question was whether it was performed on taxpayer's behalf.

Taxpayer cited to UCC section 2-314—regarding the implied warranty of merchantability, adopted in Oregon as ORS 72.3140—to show that its 100% guarantee was a "standard commercial practice for any manufacturer of a tangible good." (Ptf's Resp at 3–4.)

ORS 72.3140 is not good support for that conclusion because taxpayer's 100% guarantee allowed returns "regardless of reason," whereas ORS 72.3140 provides only that goods are warranted to meet specific standards of merchantability. Taxpayer paid its wholesalers to do more than that statute requires.

Taxpayer did not identify legal authority providing a reasonable basis for claiming Public Law 86-272 protection while making payments to wholesalers in exchange for accepting returns regardless of reason. Therefore, there is no ground under ORS 314.402(4)(b) to reduce taxpayer's understatement.

E.      *Waiver of Penalties*

The preliminary question regarding taxpayer's challenge to the department's denial of a penalty waiver is whether this court can decide that issue at all. Under ORS 314.402(6), the department "may" waive all or some of the substantial understatement penalty.[9] Neither party disputes that the word "may" indicates the penalty waiver is discretionary.

ORS 305.560(1) provides for appeals to this court "[e]xcept for an order, or portion thereof, denying the discretionary waiver of penalty or interest by the Department of Revenue[.]" The Regular Division has construed that clause to mean that "the legislature did not intend this court to review [the department's] discretion in waiving penalties or interest." *Pelett v. Dept. of Rev.*, 11 OTR 364, 366 (1990). A footnote in *Pelett* indicated that if ORS 305.560(1) were construed to allow review of penalty waiver denials, the proper standard would be abuse of discretion.

/ / /

---

[9] ORS 314.402(6) provides: "The department may waive all or any part of the penalty imposed under this section on a showing by the taxpayer that there was reasonable cause for the understatement, or any portion thereof, and that the taxpayer acted in good faith."

Taxpayer cites a single case in which a magistrate analyzed a penalty waiver denial for abuse of discretion without referring to ORS 306.560(1) or *Pelett*. *See Hansen v. Dept. of Rev.*, TC-MD 081122D, WL 3089297 at *15 (Or Tax M Div, Sept. 29, 2009) (holding no evidence of abuse of discretion); *cf. Caughlin v. Dept. of Rev.*, TC-MD 180252N, WL 4693806 at *2 (Or Tax M Div, Sept 25, 2018) (discussing uncertainty regarding possibility of review in this court). Taxpayer argues that *Pelett* no longer applies because it predates the creation of the Magistrate Division and applies only to the "orders" issued by the department as part of its former process for internal appeals. Taxpayer further asserts that there must be a forum for reviewing whether the department's penalty waiver denial violated the Due Process Clause of the U.S. Constitution and the right to "have remedy by due course of law" under the Oregon Constitution. US Const, Amend XIV, § 1; Or Const, Art I, § 10.

In the court's view, the holding of *Pelett* controls appeals of penalty waiver denials regardless of the form the denial takes. The *Pelett* court stated its holding broadly, referring to the department's "discretion in waiving penalties or interest," and did not base that holding on the statutory term "order." The footnote in *Pelett* does not alter the binding force of its holding in the Magistrate Division. Neither is the decision in *Hansen* binding; furthermore, its lack of any mention of either *Pelett* or ORS 305.560(1) indicates a likely oversight rather than a new construction of the statute. The constitutional arguments to which taxpayer alludes would be challenges to *Pelett*, to be raised in the same forum where *Pelett* could be challenged. Taxpayer does not develop an argument here, and the court does not assume a constitutional violation in the holding of *Pelett*.[10]

---

[10] As a general proposition, neither the Due Process Clause nor Article I, section 10, of the Oregon Constitution mandates the availability of judicial review over all agency determinations. *Ortwein v. Schwab*, 262 Or 375, 381–82, 498 P2d 757 (1972), *aff'd*, 410 US 656, 93 S Ct 1172, 35 L Ed 2d 572 (1973) (upholding imposition of

The court lacks authority to consider taxpayer's challenge to the department's denial of a discretionary penalty waiver.

F.      *Notices and Demands for Payment*

In its response brief, taxpayer argues for the first time that the department's notices and demands for payment should be canceled because the department improperly issued them after being notified that taxpayer intended to appeal.

The department is required to "see * * * that all taxes are collected" and that penalties prescribed by the tax and revenue laws are enforced. ORS 305.120. To that end, it is authorized to issue warrants for the collection of tax "with the added penalties, interest and any collection charge incurred." ORS 314.430(1). Before issuing such a warrant, the department must send taxpayers a written notice and demand for payment containing certain information. *Id*.; ORS 305.895(2).

Subject to exceptions not pertinent here, collections proceedings are "stayed by the taking or pendency of any appeal to the tax court." ORS 305.565(1). At issue is the meaning of the word *pendency*. Taxpayer asserts that an appeal's pendency is the period after the taxpayer's notification of the department of its intent to appeal and before the taking of the appeal or the expiration of the appeal period. In effect, taxpayer reads an appeal's *pendency* as the period when it is impending.

Dictionary definitions of *pendency* suggest another interpretation. *Pendency* is the "state or condition of being pending or continuing undecided[.]" *Black's Law Dictionary* 1154 (7th ed 1999); *cf. Webster's Third New Int'l Dictionary* 1669 (unabridged ed 2002). *Pending*, in turn, may mean either "[t]hroughout the continuance of; during" or "[w]hile awaiting; until." *Id*.

court filing fee).

Thus, an alternative to taxpayer's construction of *pendency* would refer to the period "throughout the continuance of" an appeal; that is, between the filing of an appeal and its final determination.

That definition of *pendency* fits better with the statute's additional provision for a stay upon the "taking" of an appeal. If *pendency* begins with the taking of the appeal, the stays for the "taking" and "pendency" of appeals fit together without overlap; collections are stayed by the taking of an appeal and remain stayed until the appeal is resolved. But if, as taxpayer contends, *pendency* can include some time before an appeal is taken, it must not always include such a time. There must be at least a possibility of an appeal not being pending at the time it is taken— otherwise the statutory requirement for a stay upon the "taking" of an appeal would be superfluous. Taxpayer provides for that possibility by stating that pendency begins when notice of intent to appeal is given. However, nothing in either the statute or the definition of *pendency* implies such a starting point to an appeal's pendency. Taxpayer's only source for it is a provision for relief found in the Virginia Administrative Code.[11] The Virginia provision, while illustrating a policy choice available to legislatures, is of no help in construing ORS 305.565(1).

Of more pertinence than Virginia law is the fact that the word *pendency* was introduced into ORS chapter 305 in two different places by the same act of the legislature. Or Laws 1977, ch 870, §§ 7, 11. Those two sections of the act became the predecessors of ORS 305.565(2) and ORS 305.285.

ORS 305.285 allows taxpayers who have appealed one year's property taxes to request the correction of succeeding years intervening before a final determination is made:

> "Whenever any property tax matter is appealed * * * and during the
> *pendency* of the appeal, no appeal is filed for a subsequent year or years, the

---

[11] 23 VAC 10-20-165B(2)(a) states: "Upon receipt of a complete appeal or a notice of intent to appeal within the 90-day limitations period, the department will suspend collection action on the contested assessment unless the Tax Commissioner determines collection of the assessment is in jeopardy."

taxpayer may * * * request the department to order the officer in charge of the rolls for the intervening years to correct all tax and assessment rolls for those years * * *."

(Emphasis added.) The reference to "a subsequent year or years" makes plain that the pendency of the appeal in ORS 305.285 occurs after "the property tax matter is appealed." It is the period "throughout the continuance of" the appeal. *Black's Law Dictionary* 1154 (7th ed 1999); *cf. Webster's Third New Int'l Dictionary* 1669 (unabridged ed 2002).

The court sees no reason to doubt that *pendency* holds the same meaning in ORS 305.565 as in ORS 305.285. ORS 305.565(1) therefore means that the department must stay its collection proceedings upon the taking of an appeal and may not restart them until the appeal is resolved.

In the present case, the department's notices and demands for payment were issued in accord with its mandate to collect taxes pursuant to ORS 305.120. ORS 305.565(1) did not require the department to stop its collections efforts until taxpayer's appeal was filed. Taxpayer has identified no legal authority preventing the department from issuing notices and demands for payment before the appeal period has elapsed. The court finds for the department on this issue.

### III. CONCLUSION

Because the Oregon wholesalers were entitled to remuneration from taxpayer for accepting returns, they acted as taxpayer's independent contractors under ORS 670.600(2). Their activity removed taxpayer from the protection of Public Law 86-272 and left it liable to Oregon's corporation excise tax. Taxpayer did not show a reasonable basis for claiming otherwise on its return, and the court lacks authority to review the department's discretionary denial of the substantial understatement penalty. Finally, the department was not prohibited by ORS 305.565(1) from issuing its notices and demands for payment. Now, therefore,

/ / /

IT IS ORDERED that taxpayer's Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that the department's Cross-Motion for Summary Judgment is granted.

IT IS FURTHER ORDERED that the parties shall confer and file a joint status report proposing next steps to resolve this appeal.

Dated this ___ day of February, 2019.

_____
POUL F. LUNDGREN
MAGISTRATE

***This interim order may not be appealed. Any claim of error in regard to this order should be raised in an appeal of the Magistrate's final written decision when all issues have been resolved. ORS 305.501.***

***This document was signed by Magistrate Poul F. Lundgren and entered on February 26, 2019.***